No. 19-3048

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

MARC BENJAMIN,

*Plaintiff-Appellant*,

v.

BOARD OF TRUSTEES OF BARTON COUNTY COMMUNITY COLLEGE,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
For the District of Kansas
The Honorable Julie A. Robinson
No. 2:17-CV-02557-JAR

_____

APPELLANT'S BRIEF

_____

Anthony W. Bonuchi MO #57838          Michael Stipetich KS# 21453
BONUCHI LAW, LLC                      SMITH MOHLMAN INJURY LAW, LLC
601 Walnut, Suite 300                 4600 Madison Ave., Suite 711
Kansas City, MO, 64106                Kansas City, MO 64112
(816) 944-3232; 816) 944-3233(f)      816.866.7711; 816.7715(f)
anthony@bonuchilaw.com                stip@acccidentlawkc.com

*Attorneys for Plaintiff-Appellant*

ORAL ARGUMENT REQUESTED

June 3, 2019

## SUMMARY OF THE CASE

On February 20, 2017, Marc Benjamin, the head softball coach at Barton County Community College ("the College"),[1] reported to Athletic Director Trevor Rolfs that the College's basketball programs were paying travel expenses for players in violation of the College's athletic conference's bylaws. Six weeks later, unbeknownst to Benjamin, Rolfs recommended the College decline to renew his contract. The next month, he was terminated outright.

Benjamin was dismayed. His teams were highly successful. He had never been disciplined or reprimanded. And, beyond a vague termination memo, the College did not explain the basis for his termination.

In September 2017, Benjamin filed this suit claiming retaliatory discharge.  After discovery, the District Court dismissed Benjamin's claim on summary judgment, finding insufficient evidence of retaliatory motive.

---

[1] This term includes the named Defendant, the Board of Trustees of Barton County Community College.

# TABLE OF CONTENTS

**Summary of the Case** .................................................................... i

**Table of Contents** ........................................................................ ii

**Table of Authorties** ................................................................... iv

**Jurisdictional Statement** ............................................................1

**Statement of Issue** .......................................................................2

**Statement of the Case** ................................................................4

    A.   Benjamin hired as the College's Head Softball Coach.........4

    B.   Benjamin Reports Possible Violations of Conference Rules. 7

    C.   Just weeks after Benjamin reported the KJCCC rules violations, Rolfs begins the process of removing him, unbeknownst to Benjamin. .........................................................11

    D.   Benjamin files suit for breach of contract and retaliatory discharge. ...................................................................................13

    E.   District Court recognized the prima facie case, but found no evidence of pretext.................................................................16

**Summary of the argument** ...................................................... 18

**Argument** ................................................................................ 21

    I.   The District Court erred in overlooking genuine and material factual disputes on the pretext element of Benjamin's retaliatory-discharge claim. ......................................................21

    A.   For summary judgments, the standard of review is *de novo* and the record is viewed in the light most favorable to the opposing party...........................................................................21

    B.   The *McDonnell-Douglas* framework at the summary judgment stage..........................................................................23

C.   The District Court correctly found sufficient evidence to support Benjamin's *prima facie* case of retaliatory discharge. 25

D.   Evidence of pretext can take innumerable forms and the circumstantial record must be considered as a whole. .............28

E.   The timing of Benjamin's dismissal, his lack of any disciplinary record, and the suspect timing, conduct, and documentation of the investigation support a finding of pretext here.  31

    1.   The College's suspect rationale. ...................................31

    2.   The District Court credited Rolfs' testimony and overlooked parts of Benjamin's evidence............................34

    3.   Benjamin's record of success and complete lack of prior discipline calls the College's rationales into question. ......37

    4.   Excessive documentation while failing to inform Benjamin of the allegations evidence a sham investigation.  41

    5.   Benjamin's arguments have been preserved, but to the extext the Court finds otherwise, plain error review should apply. ...................................................................................49

**Conclusion** ................................................................................ **52**

**Memorandum and Order** ......................................................... **53**

**CERTIFICATE OF COMPLIANCE** .......................................... **54**

**CERTIFICATE OF SERVICE** .................................................... **55**

# TABLE OF AUTHORTIES[2]

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986)..........24

*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240-42 (10th Cir. 2004) ...............................................................................38

*Beaird v. Seagate Tech.*, 145 F.3d 1159, 1173-74 (10th Cir. 1998) ...............................................................................30

*Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1149 (10th Cir. 2011).................................................................29

*Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1379 (10th Cir. 1994).22

*Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314-15 (10th Cir. 2017) ...............................................................47

*EEOC v. Heartway Corp.*, 466 F.3d 1156, 1168 (10th Cir. 2006) 35

*Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) .............................................................21, 24, 25, 30

*Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004) ...............................................................18

*Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289-90 (10th Cir. 2013) ...............................................................39

*Marshall v. GM LLC*, No. 16-cv-2651-JWL, 2017 U.S. Dist. LEXIS 187546, at *26-28 (D. Kan. Nov. 14, 2017)...................42

*McDonnell-Douglas Corp. v. Green*, 141 U.S. 792, 824 (1973).....18

*Palmer v. Brown*, 752 P.2d 685, 690 (1988) ...........................18, 26

*Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1204 (10th Cir. 2000).36, 43

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ...............................................................23

*Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th 2011)...49

*Ragsdale v. Amsted Rail Co.*, No. 13-2257-EFM, 2014 U.S. Dist. LEXIS 143166, at *7 (D. Kan. Oct. 7, 2014)..............................28

---

[2] There are no related cases.

*Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) .................................................................................. passim

*Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008) 29, 47, 48

*Voltz v. Coca-Cola Enters.*, 91 F. App'x 63, 68-69 (10th Cir. 2004) ........................................................................................ 29, 30

**Statutes**

8 U.S.C. § 1291 ............................................................................ 1

**Rules**

Fed. R. Civ. P. 56(a) .................................................................. 21

# JURISDICTIONAL STATEMENT

The United States District Court for the District of Kansas entered final judgment dismissing Benjamin's complaint in its entirety on February 1, 2019 (Aplt. App. 455).[3] Benjamin timely filed his notice of appeal on March 4, 2019. (Aplt. App. 456)

The District Court properly exercised jurisdiction over this matter under 28 U.S.C. § 1332 because Plaintiff is a resident of North Carolina, the College is located in Kansas, and the amount in controversy exceeds $75,000. This Court thus has jurisdiction over this appeal under 28 U.S.C. § 1291.

---

[3] "Aplt. App." refers to Appellant's Appendix.

1

# STATEMENT OF ISSUE

Summary judgment is improper in retaliatory-discharge cases where circumstantial evidence of retaliatory intent exposes the employer's reason for termination as mere pretext. Viewed in Benjamin's favor, the evidence here shows the College moved to terminate him just weeks after he reported potential violations of conference rules, that Benjamin had never been disciplined or reprimanded, that the College papered his file with questionable complaints for the first time just before firing him, and that the College intentionally did not inform him of those complaints until this lawsuit was filed. Did the District Court err by concluding as a mater of law that no rational jury could find the College's rationale for terminating Benjamin was just pretext?

- *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530 (10th Cir. 2014)

- *Foster v. AlliedSignal Inc.*, 293 F.3d 1187 (10th Cir. 2002)

- *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, (10th Cir. 2011)

2

## STATEMENT OF THE CASE

### A.    Benjamin hired as the College's Head Softball Coach.

Marc Benjamin was hired by Barton County Community College to be its head woman's softball coach in August 2013. (Aplt. App. 423).[4] The Athletic Director, Trevor Rolfs, interviewed Benjamin and recommended to the Board of Trustees that he be hired. (Aplt. App. 291). As Athletic Director throughout Benjamin's time at the College, Rolfs was Benjamin's immediate superior. (Aplt. App. 99). Benjamin's employment was governed by annual contracts that ran from August 1 through May 31 each academic year. *Id*. Rolfs recommended that Benjamin's contract be renewed for the years 2014-15, 2015-16, 2016-17. *Id*.

As with any job, the College has expectations for its softball coach:

> The Head Coach is responsible for achieving the mission and goals of the Athletic Department through his/her sport. The Head Coach will produce a program that is

---

[4] Basic undisputed facts are cited to the District Court's judgment. Otherwise, citations are to the summary judgment record built by the parties in the District Court.

competitive within the conference: adheres
to conference and NJCAA standards, and
College policies; attracts student-athletes
who are good citizens of the college and the
community; has its student-athletes
graduate on time and able to transfer; and
instills pride in the College and the
Community.

(Aplt. App. 64). The job description identifies some central

responsibilities of the coach, which include establishing and

managing a functional budget, signing athletes that are

positive role models, and fielding athletes and teams that

are capable of successfully competing for conference,

regional, and national championships. *Id*. The job

description also provides that coaches are expected to be

professional and supportive in their work with students,

support staff, the Athletic Director, and other coaches and

College personnel. *Id*. at 64-65.

The College's softball program amassed an impressive

record of success under Benjamin's stewardship. In his

second year, 2014-2015, the team won the NJCAA ("National

Junior College Athletic Association") Region VI

Championship. (Aplt. App. 101-02). In 2015-2016, the team

set a school record for victories, going 51-8. (Aplt. App. 102,

324). In 2016, one of the team's players was named a NJCAA

Third-Team All-American. (Aplt. App. 102). All told, during

his tenure, Benjamin compiled a record of 108 wins to 52

losses (a winning percentage of 67.5%). *Id*.

Before the start of the 2016-2017 season, the softball

program experienced unexpected attrition. Benjamin was

caught off guard when six or seven student-athletes decided

not to return. (Aplt. App. 236). According to Benjamin, the

reasons were varied:

> [O]ne left in the fall because she was home
> sick. She was from Utah. . . . Two players
> had too many credit hours and decided they
> would go on because . . . it didn't make any
> sense for them to come back and my pitcher
> had a full ride scholarship so she took that
> offer. My other player went back to Utah
> because she couldn't afford to stay at Barton
> and one of the players ended up staying on
> and playing volleyball and graduating in
> the fall.

(Aplt. App. 236).[5] The team played with a roster of

between twelve and fifteen during the 2016-2017 season.

---

[5] In its summary judgment briefing, the College draws
different inferences from these and other facts in the record.

(Aplt. App. 106). Nevertheless, the team still posted a

winning record, going 30-16. *See*

http://www.bartonsports.com/sports/sball/2016-17/schedule

(last accessed May 31, 2019).

The natural recruiting cycle meant the roster crunch

would be confined to the 2016-2017 season. During the

summer (when recruiting for the following season occurs) of

2016, Benjamin secured thirteen Letters of Intent (i.e.,

promises from recruits to attend the College) for new

students for the coming 2017-2018 season. (Aplt. App. 236).

## B.  Benjamin Reports Possible Violations of Conference Rules.

According to its Commissioner, Bryce Roderick, the

Kansas Jayhawk Community College Conference ("KJCCC")

prohibits its members, which include the College, from

providing any paid travel to any signed student athletes at

---

While those assertions will be addressed in the argument
section, Benjamin's account of the facts keeps in mind that
on summary judgment, the record and disputed facts must
be viewed in the light most favorable to the non-moving
party. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538
(10th Cir. 2014).

any time. (Aplt. App. 426). KJCCC's bylaws only allow

funding for recruits to travel to and from the College up until

ten days before the start of a semester. *Id*. In July 2016, the

KJCCC Commissioner reiterated this rule in an email to the

Colleges and he admonished those who had been paying for

student athlete travel in violation of the rule to self-report.

(Aplt. App. 427).

Unlike the KJCCC, the NJCAA, of which the College is

also a member, does allow its members to pay for travel

expenses to and from college once per academic year, per

athlete. (Aplt. App.425).

On February 20, 2017, Benjamin met with Rolfs and

reported that the College's men's and women's basketball

coaches had paid for student flights to and from home. (Aplt.

App. 427). Benjamin had "received a list of at least six

players whose flights appeared to have been paid for by the

athletic department and a student whose flight had been

paid for by another coach." (Aplt. App. 427). Benjamin came

forward with this information "because he was concerned

about potential violations" and he did not want "Rolfs to be caught off guard" if this information became public. *Id*. at 428. According to Benjamin, Rolfs appeared uncomfortable and irritated during the February 20 meeting. *Id*.

Rolfs testified that he looked into Benjamin's complaints. *Id*. According to the College, he found payments related to transportation for three men's basketball players and one women's basketball player. *Id*. Rolfs maintains that there was no violation of KJCCC rules because, allegedly, three of these instances involved recruiting trips and the other occurred before Commissioner Roderick sent his clarifying email in July 2016. *Id*.

Later during discovery in this case, Rolfs acknowledged that as Athletic Director he reviewed and approved flights for students purchased by the College and those that were purchased by head coaches. *Id*. at 426.

On March 7, 2017, Rolfs informed Commissioner Roderick that he was investigating Benjamin's allegations of potential violations. *Id*. at 428. He represented that there were two

9

requisitions submitted before the July 2016 email. *Id*. Rolfs agreed to complete the internal investigation and report back, at which point Roderick would determine if violations had occurred and if so what sanction to impose. *Id*. Yet that same month, March 2017, Rolfs told Benjamin he had looked into the allegations and spoken to Roderick and "that the College was okay." *Id*. at 428-29.

On May 20, 2017, about two weeks after the College fired Benjamin, Rolfs met with Commission Roderick to discuss the alleged violations. When the meeting closed, Roderick informed Rolfs that no sanction would be issued. *Id*. at 430.[6]

---

[6] In its motion for summary judgment, the College gave extensive treatment to facts surrounding whether Benjamin's reporting of these potential violations raise a retaliatory-discharge claim at all. But the District Court found Benjamin met his burden of establishing a prima facie case of retaliatory discharge. (Aplt. App. 441). Because Benjamin challenges the District Court's lack-of-pretext finding, further exposition of facts underlying the prima facie elements is unnecessary at this point.

**C.    Just weeks after Benjamin reported the KJCCC rules violations, Rolfs begins the process of removing him, unbeknownst to Benjamin.**

Although Benjamin was unaware of it, on or around April 11, 2017 – only six weeks after Benjamin's report to Rolfs about rules violations – Rolfs informed Julie A. Knoblich, the College's Director of Human Resources, of his decision not to recommend renewal of Benjamin's contract. (Aplt. App. 111). Rolfs reported that Benjamin had "blown" through his $18,000 fundraising budget; was disgruntled; started the 2016-2017 school year with only nine players; "appears to be miserable"; does not take care of the field; had been the subject "of some parent and player complaints," which allegedly indicated that he was "taking things" out on his players. (Aplt. App. 484).

As Rolfs now tells it, "over the next few days, I received a number of telephone calls and emails from softball team members and parents about Mr. Benjamin's behavior." (Aplt. App. 111). He created a report that included a timeline of Benjamin's alleged past issues and those 2017 complaints

11

along with emails he asked the complaining parties to send him. *Id*. at 111-12, 297. Rolfs then met with the College President, Dr. Carl Heilman, to recommend not renewing Benjamin's contract. *Id*. at 111-12. Rolfs later testified that he does not maintain timelines of issues on other coaches. (Aplt. App. 297-98).

Rolfs did not mention these complaints or issues with Benjamin or to Benjamin's Assistant Coach, Anna Voss. (Aplt. App. 300, 332, 340, 346, 357, 405). Neither Rolfs nor anyone else at the College made Benjamin aware of Rolfs' report or its contents. *Id*. at 332, 340.

Instead, Benjamin first learned there was an effort to remove him the day he was terminated. On May 8, 2017, Rolfs delivered a termination memo to Benjamin. (Aplt. App. 112). The memo listed no specifics, stating simply that Benjamin was being terminated for "(1) insubordination; (2) verbal harassment; (3) unprofessional conduct; and (4) all of these items establishing your inability to manage the Softball Program in an appropriate and professional

12

manner." (Aplt. App. 503). Rolfs offered no elaboration on the reasons for the College's action and Benjamin was given no opportunity to learn why this action was taken. (Aplt. App. 300, 347).

### D. Benjamin files suit for breach of contract and retaliatory discharge.

In September 2017, Benjamin filed this lawsuit. (Aplt. App. 1). His complaint alleges counts for retaliatory discharge and breach of implied and express contract. (Aplt. App. 11-14). The District Court dismissed each of his claims on summary judgment. *Id.* at 454. This appeal deals only with the dismissal of Benjamin's retaliatory-discharge claim.

For this count, Benjamin claims the College and Rolfs terminated him because he reported alleged violations of KJCCC bylaws prohibiting the College from paying for student athlete travel. (Aplt. App. 11-12). In discovery, Benjamin learned for the first time specifics of the College's purported rationale its actions. *Id.* at 332, 340, 357.

The reasons, according to Rolfs, were that the College claims Benjamin spent too much from the softball program's

13

fundraising account without replenishing it; that two players had complained about how Benjamin treated them in 2013 and 2015; that in 2016 Benjamin became disgruntled and allegedly no longer wanted to be at the College; that on one occasion in January 2016 he used foul language toward another member of the Athletic Department in a disagreement at a basketball game; that alleged recruiting and retention failures led to there only being nine players on the roster as of August 2016 and only twelve on the team at the end of the season; and that in April 2017 five players made complaints about the way Benjamin treated them and conducted himself. (Aplt. App. 103-10, 111-12, 484-488).

During discovery, both Rolfs and Benjamin testified that Benjamin had managed the budget within his discretion as head softball coach. (Aplt. App. 104, 265, 326). They both testified that Benjamin was not disciplined over the January 2016 disagreement (Aplt. App. 105, 300). They both likewise said no discipline followed from the two pre-2016 player complaints, which Rolfs noted were not unusual or

concerning given the competitive nature of collegiate athletics. (Aplt. App. 103, 330-31). They both acknowledged that Benjamin had never been disciplined for any reason and that on Rolfs' recommendation Benjamin's contract was renewed in the fall of 2016. (Aplt. App.103-105).

As for recruiting issue and the April 2017 player complaints – grounds the College never shared with Benjamin – Benjamin provided evidence that conflicted with Rolfs' accounts. As noted above, he testified that the shortage of players in 2016-2017 was due to players leaving unexpectedly for various reasons specific to their own circumstances. (Aplt. App. 236). According to Benjamin, the departures were not because Benjamin was on his way out or failed to recruit. *Id*. Rather, Benjamin explained that during the summer of 2016 he obtained thirteen Letters of Intent for the 2017-2018 season. *Id*.

Finally, Benjamin denies the player-based allegations against him. He and his assistant Voss testified that he maintained the same coaching style and positive attitude

through his four years at the College. (Aplt. App. 266, 270).

He denies belittling players, making inappropriate remarks

about players, the College, or Rolfs. (Aplt. App. 331-48). And

Benjamin stated that the April 2017 complaints stemmed

from five players, four of whom had been disciplined or

dismissed for violating team rules or, in some cases, the law.

(Aplt. 324, 333, 337, 342). Benjamin also disputed

statements attributed to him by Knoblich and Rolfs about

his state of mind and conduct. (Aplt. App. 346-48).

### E. District Court recognized the prima facie case, but found no evidence of pretext.

At the close of discovery, the College moved for summary

judgment on Benjamin's retaliatory discharge claim,

attacking each element. (Aplt. App. 51). In support, they

relied primarily on Rolfs' word and the pre-termination

report he created. (Aplt. App. 56-77). The District Court

found Benjamin had carried his burden to show triable

issues on the prima face case. (Aplt. App. 440-41). That is,

the order explains a reasonably prudent person could have

16

concluded that (1) the College violated rules pertaining to the "public health, safety, or general welfare," (2) the College had knowledge of Benjamin's reporting the alleged violation before he was terminated, and (3) that the College terminated Benjamin in retaliation for his complaints. *Id*. Nevertheless, the District Court dismissed Benjamin's claim. It found that there was no evidence from which the jury could reasonably find that the reasons the College gave for Benjamin's termination were merely pretextual. *Id*. at 454.

This appeal follows.

## SUMMARY OF THE ARGUMENT

Kansas recognizes a public policy exception to the employment at-will doctrine. *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004). This retaliatory-discharge claim protects whistleblowers by holding employers liable in tort for terminating any employee in retaliation for reporting violations of laws, rules, or regulations that deal with public health, safety, and general welfare. *Palmer v. Brown*, 752 P.2d 685, 690 (1988).

This cause of action by definition turns on the employer's intent. Because intent is almost always proved by circumstantial evidence, Kansas courts have adopted the tripartite burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 141 U.S. 792, 824 (1973). In short, a plaintiff must make a prima facie a case that he engaged in some protected activity and that he was terminated as a result. If the employer then comes forward with a legitimate non-retaliatory reason for the discharge, the plaintiff must show

18

that reason was in actuality just pretext (or cover) for the employer's retaliatory motive.

Here, the District Court found Benjamin made his prima facie case, but it erred in applying the pretext element of the test. Contrary to the order, there was ample circumstantial evidence in the record for a jury to rationally find the College's reasons were simply cover. To begin with, there is the short time period between Benjamin's reporting of the KJCCC violations and when Rolfs began his effort to remove him as coach.

Two other broad categories of evidence bolster the case for pretext. First, a substantial amount of the reasons Rolfs listed as grounds for termination occurred long before Benjamin's report or Rolfs' decision to cause his removal in April 2017. Rolfs was aware of two player complaints, the January 2016 incident at the basketball game, and Benjamin's alleged lack of fiscal discipline with the softball budget before 2017. Not one of these issues was the subject of any discipline or reprimand. To the contrary, Rolfs

19

recommended Benjamin's contract be renewed in 2016 and it was. From this a jury could find that Rolfs' and the College's grounds for the discharge are incredible.

Second, the manner in which Rolfs documented and conducted the effort to oust Benjamin is suspect in its own right. Rolfs concedes, as he must, that he created a timeline of past conduct – conduct that had never before been the subject of any discipline – to support the College's action. Not only that, but he never told Benjamin about the 2017 player complaints or the so-called recruiting failure that he included in his report. Critically, when those 2017 "issues" are examined in the light most favorable to Benjamin, a reasonable jury could conclude that Rolfs and the College did not truly believe they were termination-worthy.  On this record, a jury can infer retaliatory intent. The District Court's dismissal of Benjamin's retaliatory-discharge claim should be reversed.

# ARGUMENT

## I. The District Court erred in overlooking genuine and material factual disputes on the pretext element of Benjamin's retaliatory-discharge claim.

### A. For summary judgments, the standard of review is *de novo* and the record is viewed in the light most favorable to the opposing party.

The propriety of summary judgment is reviewed *de novo*, with the appellate court applying the same bedrock standards as the District Court. *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). Under Rule 56 of Federal Rules of Civil Procedure, summary judgment is only appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (quoting Fed. R. Civ. P. 56(a)). To defeat a motion for summary judgment, the non-moving party "must establish, at a minimum, an inference of the existence of each essential element to the case." *Id*. Facts are "material" when they affect the outcome of the suit.

*Smothers*, 740 F.3d at 538. And a dispute "is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

Rule 56 also orders the process for building the summary judgment record. As the moving party, the College has the initial burden to identify "the portions of the pleadings, depositions and the like which it believes demonstrate the absence of a genuine issue of material fact." *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1379 (10th Cir. 1994). Benjamin must then respond to the College's allegations and "identify sufficient evidence that would require submission of the case to a jury." *Id.*

Because summary judgment deprives Benjamin of a trial on his claim, the Supreme Court demands he be given the benefit of every reasonable doubt. The facts are viewed in the light most favorable to him, and all reasonable inferences are drawn in his favor. *Smothers*, 740 F.3d at 538. Importantly for this case, courts "*must* disregard all evidence favorable to the [College] that the jury is not required to

believe." *Id*. (emphasis added) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Along the same lines, "the pleadings and documentary evidence [are construed] liberally" in Benjamin's favor. *Cole*, 43 F.3d at 1379.

### B. The *McDonnell-Douglas* framework at the summary judgment stage.

As previewed above, courts analyze circumstantial retaliation cases like this one in three steps under *McDonnell-Douglas*. The plaintiff must first "establish a prima facie case of discrimination or retaliation." *Smothers*, 740 F.3d at 538. Once that hurdle is cleared, it is up to the employer to "offer a legitimate non-discriminatory reason" for its action. *Id*. The burden then shifts back to the plaintiff, who "must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Id*.

In Kansas, the plaintiff is required to prove the pretext element with "clear and convincing evidence." *Foster*, 293

F.3d at 1193. This standard of proof does not alter the burden of proof, which remains the preponderance of the evidence. *Id*. In this context, "clear" means "certain, unambiguous, and plain to the understanding," and "convincing" means "reasonable and persuasive enough to cause the trier of facts to believe it." *Id*. at 1194.

While the summary judgment record must be considered with the required quality of proof in mind, it is not "a license to engage in a mini-trial." *Id*. at 1195 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986)).  The Supreme Court was crystal clear that summary judgment does not supplant "the role of the jury" and "[i]t by no means authorizes trial on affidavits." *Anderson*, 477 U.S. at 255. It remains, as always, the province of the jury – and the jury alone – to make credibility determinations, to weigh the evidence, and to draw reasonable inferences from the facts. *Id*. That is why, at the summary judgment stage at least, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*.

24

This Court summed up the role of judges at this pre-trial stage in equally clear terms. The obligation to apply the "clear-and-convincing standard of proof at summary judgment does not authorize" judges "to perform jury functions." *Foster*, 293 F.3d at 1195. Rather, "[o]ur role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Id*.

*Foster* tied all these threads together in a succinct statement of the plaintiff's burden. An employee opposing summary judgment must "set forth evidence of a clear and convincing nature that, if believed by the [jury], would establish [he] was more likely than not the victim of illegal retaliation." *Id*. Benjamin's proof meets that standard.

## C. The District Court correctly found sufficient evidence to support Benjamin's *prima facie* case of retaliatory discharge.

The elements of Benjamin's claim are not in dispute. To recover on his whistleblower count, Benjamin must prove (1) a reasonably prudent person would have concluded the

College "violated rules, regulations, or the law pertaining to public health, safety, and the general welfare;" (2) the College knew Benjamin reported a qualifying violation before it discharged him; and (3) the employee was discharged in retaliation for making the report. *Palmer*, 752 P.2d 690.

The District Court found the evidence supported each of these elements. The College admits that Benjamin reported to Rolfs on February 20, 2017 several instances in which the basketball programs paid for travel expenses of its players. (Aplt. App. 443-44). The facts also show KJCCC strictly prohibits paying travel expenses for student athletes and that the College did in fact pay for such travel. *Id.* at 444. Given the low bar for establishing a prima facie case at summary judgment, these two facts were sufficient to meet the first element. (Aplt. App. 444-45).

The second and third elements are likewise met here. It is undisputed that Benjamin reported these violations to Rolfs on February 20, 2017. *Id.* at 446. It is undisputed that just

six weeks later Rolfs began the process of discharging

Benjamin, which occurred in early May 2017. *Id*.

The College argued Rolfs was a wrongdoer and thus

reporting to him did not show knowledge by the College. *Id*.

But there is no evidence Benjamin was accusing Rolfs of

wrongdoing – Benjamin was simply reporting that the

basketball coaches had paid for players' travel. *Id*. The

District Court thus rejected the College's contention that

Benjamin failed to make a qualifying report of wrongdoing.

*Id*. at 447.

The College's argument that it did not know about

Benjamin's whistleblowing suffered the same fate. The court

correctly noted that the jury could infer knowledge on the

College's party because Rolfs met with the College President

and recommended removing Benjamin by not renewing his

contract. *Id*. at 449-50. The decision was then made to

terminate Benjamin following the softball season, which Rolf

did when he delivered the termination memo to Benjamin.

*Id*. Coming just weeks after Benjamin reported the

violations, the District Court correctly found that the temporal proximity of Rolfs' actions was alone sufficient to show the causation element. Moreover, while the District Court did not mention it, the jury can also infer that Rolfs directly participated in the termination, which also satisfied causation at the prima facie stage. *See Ragsdale v. Amsted Rail Co.*, No. 13-2257-EFM, 2014 U.S. Dist. LEXIS 143166, at *7 (D. Kan. Oct. 7, 2014) (finding prima facie case for knowledge element met when those with knowledge of protected whistleblowing participated with decision-makers in termination).

### D. Evidence of pretext can take innumerable forms and the circumstantial record must be considered as a whole.

The District Court's application of Rule 56 broke down at the pretext stage. The College claims to have terminated Benjamin for insubordination, verbal harassment, and unprofessional conduct. (Aplt. App. 450). But when the record is viewed in Benjamin's favor, and when evidence in favor of the College that jury is not required to believe is

disregarded, it is evident that a jury could reasonably infer a retaliatory motive in this case.

Benjamin's burden at the pretext stage is to point to clear and convincing proof that the reasons offered by the College for his termination are not its true reasons, but are a pretext for retaliation. *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1149 (10th Cir. 2011). As this Court has repeatedly said, "there is no one specific mode of evidence required to establish the discriminatory inference." *Carter*, 662 F.3d at 1150; *Smothers*, 740 F.3d at 539; *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008). Circumstantial evidence of pretext can take many forms. *Carter*, 662 F.3d at 1150. For example, pretext can be inferred from evidence showing that the stated reasons are false. *Id*. It can likewise be inferred from evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation" such that the jury could reasonably find them "unworthy of credence." *Voltz v. Coca-Cola Enters.*, 91 F. App'x 63, 68-69 (10th Cir. 2004). This type of evidence,

when coupled with a prima facie case, makes summary judgment improper. *Foster*, 293 F.3d at 1194; *Voltz*, 91 (F. App'x at 72-73 (holding that plaintiff is not required to prove the employer's reason is literally untrue or impossible).

Importantly, the plaintiff need not "prove that the discriminatory motive was the *sole* reason for his firing; rather, he must show only that it was a "determining factor." *Id*. Nor must he prove the employer's rationale was factually impossible. *Foster*, 293 F.3d at 1196. A plaintiff instead meets his burden if the jury could believe that the "discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Id*.

In examining pretext, the record is to be taken as a whole. In *Beard v. Seagate Tech.*, 145 F.3d 1159, 1173-74 (10th Cir. 1998), this Court noted that none of the circumstantial evidence would suffice standing alone. But the plaintiff's claim survived because the court is "required to consider the totality of such circumstantial evidence." *Beard*, 145 F.3d at 1174. This necessarily includes the same evidence that

establishes the prima facie case. The jury "may still consider

the evidence establishing the plaintiff's prima facie case and

inferences properly drawn therefrom on the issue of whether

the defendant's explanation is pretextual." *Foster*, 293 F.3d

at 1194.

> ### E. The timing of Benjamin's dismissal, his lack of any disciplinary record, and the suspect timing, conduct, and documentation of the investigation support a finding of pretext here.

Athletic Director Rolfs and the College rely on a handful

of items they say form the bases of Benjamin's termination.

But on close examination, when the record is viewed in

Benjamin's favor, there are several reasons the jury could

use to find this story is unworthy of credence.

### 1. The College's suspect rationale.

Rolfs testified that after coaching his team to a regional

championship in 2015, Benjamin began "insinuat[ing]" that

he felt underappreciated. (Aplt. App. 66). He heard rumors

that Benjamin was actively looking to use his admitted

success at the College to find a better coaching position

elsewhere. *Id*.

Benjamin explained it differently. He testified that he felt the softball program was underappreciated in that it was not given adequate resources. (Aplt. App. 326, 338). And he acknowledges applying for other jobs, but he notes that he was exploring his value in the market more than anything else. (Aplt. App. 348, 356). In fact, he withdrew his name from consideration on the only position for which he was named a finalist. *Id.*

Rolfs claims "Benjamin's attitude and behavior" became a problem by January 2016. *Id.* Benjamin allegedly became "disgruntled" and exhibited a "poor attitude." *Id.* Rolfs points to one instance in which Brooke Thompson, the College's Athletics Auxiliary Services/Compliance Supervisor, alleged that Benjamin yelled and cursed at him after a basketball game because he was angry about how his assistant, Anna Voss, had been treated while she worked the scorer's table. *Id.* This, Rolfs maintains, violated Benjamin's obligation of professionalism. *Id.* at 66-67.

Rolfs claims "another problem with Mr. Benjamin surfaced in May 2016" based on his use of the softball program's fundraising account, which held $18,000 when Benjamin was hired. *Id*. at 67. Even while noting that Benjamin "has discretion" to use that fund, Rolfs asserts Benjamin had failed to be fiscally responsible because the balance of the account was only $1,000 in May 2016 and no improvements had been made to the softball facilities. *Id*.

Next, Rolfs claims Benjamin violated the terms of his contract by not consistently fielding players and teams that compete for championships. The basis for this claim is that in August 2016 the team had only nine players on its roster and that it had only twelve by season's end. *Id*. at 68-69.

Finally, Rolfs' memorandum supporting his recommendation to end Benjamin's employment cites complaints from seven players (three were from parents of players) about how Benjamin treated them and unprofessional statements he and his assistant Anna Voss purportedly made. (Aplt. App. 111-12, 488, 498-502). One

33

complaint was received in 2013, one in 2015, and five were received, according to Rolfs, in April 2017, which was just before Rolfs began the process of removing Benjamin. Rolfs also maintains that at the time he believed Benjamin was "taking things" out on his players. (Aplt. App. 484).

On April 11, 2017, Rolfs explained to Knoblich that he was recommending that the College not renew Benjamin's contract. (Aplt. App. 111). That same day he created a report for the College, which for the first time set out these alleged issues as justification for his recommendation. (Aplt. App. 111-12, 297). He also asked those who lodged the complaints to put them in email form so he could attach them to his memo. (Aplt. App. 297-98, 405).

### 2. The District Court credited Rolfs' testimony and overlooked parts of Benjamin's evidence.

The court's summary judgment cannot rest on these allegations. To begin with, they are mostly built on evidence, like Rolfs' testimony, the jury isn't required to believe. At summary judgment, the court "must disregard all evidence

34

favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. As this Court has explained, a defendant is "is not entitled to judgment as a matter of law just because there was evidence that, if believed, would have weighed heavily in [its] favor." *EEOC v. Heartway Corp.*, 466 F.3d 1156, 1168 (10th Cir. 2006).

In *Heartway*, the defendant argued it had terminated the employee not because she had hepatitis C but because she lied about it on her application. *Heartway*, 466 F.3d at 1168. In support, it pointed to testimony from its manager saying as much, which the employer alleged was "uncontroverted." This Court rejected the argument, noting that a jury could certainly agree with that testimony and find for the employer, it "was also entitled to conclude that [the manager] was not entirely truthful at trial and that he misled" the plaintiffs "when he told her that she was being fired for lying on her application." *Id*.

The District Court's order misapplies this rule. As one primary example, in addressing the conspicuous timing of

Rolfs' report on Benjamin, it relies on Rolfs' own testimony that "things are documented throughout the course of the year." (Aplt. App. 453-54).[7] But the jury is not required to believe Rolfs, particularly given the absence of other documentation from him in the record. Rather, the jury is free to consider the other evidence suggesting this documentation was designed to cover for Rolfs' and the College's retaliatory motives. *See Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1204 (10th Cir. 2000) (holding that sudden documentation of alleged past issues to support termination can be circumstantial evidence of retaliatory motive). The District Court erred in relying on Rolfs' testimony and inferences in favor of the College from the record to support the notion that the jury could not rationally believe its reasons were pretext.

---

[7] Some other examples of this include the order's statement that, according to Rolfs, during his 2016 annual review Benjamin was "insinuating that Rolfs should not worry about" the fundraising budget, facility maintenance, or his attitude. (Aplt. App. 430). In another instance, the order states that Rolfs observed "there were few Letters of Intent" in the summer of 2016, and that Rolfs viewed this "failure to recruit" as a violation of Benjamin's contract. *Id*. at 431.

It is worth reiterating here that the existence of valid non-retaliatory reasons for Benjamin's termination is not dispositive of the pretext issue. For even if the College "provide[s] a valid reason for terminating [Benjamin] under applicable law, a reasonable jury could . . . nonetheless conclude that [Benjamin] was *actually* fired" for his whistleblowing. *Carter*, 662 F.3d. at 1149 (emphasis). The *Heartway* case provides a good example of this rule. The court found the plaintiff had in fact lied on her application about her disability. But the jury was free to find, as it did in that case, the she was truly fired for having a disability – not because of her untruthfulness. *Heartway*, 466 F.3d at 1167-68.

### 3. Benjamin's record of success and complete lack of prior discipline calls the College's rationales into question.

Not only did the District Court mistakenly rely on Rolfs' testimony, it failed to properly draw the inferences from the record in Benjamin's favor. At the summary judgment stage, courts are "to believe" the nonmoving party's evidence and

grant all reasonable inference therefrom in his favor.

*Anderson*, 477 U.S. at 255. As will be seen, there are several

facts that, when coupled with the close temporal proximity

between Benjamin's whistleblowing and his termination, the

jury could rationally use to find the College's entire bases for

its action are unworthy of belief. *See Annett v. Univ. of Kan.*,

371 F.3d 1233, 1240-42 (10th Cir. 2004) (noting that

temporal proximity is circumstantial evidence of pretext,

though it cannot be the only evidence of it).

First, as Rolfs himself admits, Benjamin complied a

terrific record of success during his time at the College and

was never been disciplined or reprimanded in any way.

(Aplt. App.101-02, 105, 300, 378). In fact, before his pre-

termination report, it does not appear Rolfs' made any effort

to document any significant issues with Benjamin's conduct

or his performance. The jury could infer from this record

that the charges against Benjamin were at a minimum

exaggerated, particularly since Rolfs admitted that many of

the alleged issues arose before he recommended in renewing

Benjamin's contract in 2016. (Aplt. App. 105).

The District Court paid short shrift to this evidence of

pretext. Citing *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283,

1289-90 (10th Cir. 2013), it found that because the College

had no mandatory policy of progressive discipline, the lack

any prior discipline was irrelevant to show pretext. But

*Lobato* did not say there must always be a progressive

discipline policy before lack of any discipline before

termination can be cited as evidence of pretext. The court

there was merely reacting to the plaintiff's contention in that

case that the employer had actually breached an implied

progressive discipline policy. *Lobato*, 733 F.3d at 1289-90

(noting plaintiff argues the employer "failed to follow its

unwritten policy of using 'progressive discipline'").

But Benjamin's claim does not rest on the notion that the

employer's investigatory conduct violated its own policies.

Nor is it required to. To the contrary, there is no limited set

of routes to showing pretext. Indeed, "[a] plaintiff may not be

39

forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Carter*, 662 F.3d at 1150.

Benjamin's lack of prior discipline shows Rolfs' claims are unworthy of credence. On Rolfs' recommendation, Benjamin's contract was renewed in or around June 2016. Rolfs was aware of the status of the fundraising budget in May 2016. He was aware of the basketball game incident in January 2016. He knew players had complained that Benjamin had belittled them or treated them harshly in 2013 and 2015. He even appears to have known that the roster in 2016-2017 might be short.

Moreover, this lack of any record or discipline shows a shift in how Rolfs handled the incidents he now claims support termination. For example, there is evidence that Rolfs did not consider the type of complaints lodged here to be particularly troubling. (Aplt. App. 103, 105). After all, no discipline or reprimand followed after the 2013 and 2015 player complaints.

The same inconsistency can be seen with Rolfs'
statements about the January 2016 disagreement between
Benjamin and Thompson and the alleged problems with the
softball budget. Rolfs acknowledges knowing about both
issues before conducting Benjamin's annual review in 2016.
Yet no discipline or reprimand occurred. Instead, Rolfs
recommended renewing Benjamin's contract and his salary
was increased. (Aplt. App. 105).

Taken together, this evidence, and the inferences that can
be drawn from it, discredits the whole of the College's
rationale here. As this Court has explained before, an
employee does not always have show that each reason is
pretextual. Rather, pretext can be show with evidence that
renders even one of several bases so doubtful that all the
reasons can be said to be pretext. *See Lobato*, 733 F.3d at
1289.

**4. Excessive documentation while failing
to inform Benjamin of the allegations
evidence a sham investigation.**

41

The manner and timing of Rolfs' investigation and documentation also supports a reasonable inference of pretext. Instead of coming to Benjamin with this issues, as one might expect a manager looking to address them to do,[8] Rolfs set about building a paper trail to support Benjamin's discharge against a challenge. The jury could reasonably infer that Rolfs intentionally papered Benjamin's file either to support the College's action against attack or to keep him in the dark about the allegations Rolfs was documenting, or both. This type of documentation is proper evidence of retaliatory motive. *See Pastran*, 210 F.3d at 1204, 1206; *see also Marshall v. GM LLC*, No. 16-cv-2651-JWL, 2017 U.S. Dist. LEXIS 187546, at \*26-28 (D. Kan. Nov. 14, 2017).

In *Pastran*, a Hispanic K-Mart employee (Pastran) reported that he lost a promotion based on discrimination by

---

[8] The salacious nature of a couple statements attributed to Benjamin raise considerable suspicion as to why Rolfs would not have asked Benjamin about them. For instance, one complaint – which Benjamin steadfastly denies – alleges that Benjamin said of a player whose was complaining of back pain: her "back hurts because she is always with black guys." (Aplt. App. 492).

42

his store manager. Nine weeks later, the since promoted
Pastran was fired by the same store manager, purportedly
for insubordination. *Id*. at 1204. Between the time of the
incident and the firing, the store manager consulted with the
district manager and the legal department to discuss how to
handle the termination and "preparing statements regarding
the lost" promotion. *Id*. at 1204. Reversing the grant of
summary judgment for K-Mart, this Court found that the
jury could consider the preparation of documents in
anticipation of litigation "circumstantial evidence of
retaliatory motive." *Id*. at 1206.

The District Court found the documentation issue
unpersuasive because some of the complaints did not
originate from Rolfs. But here again the court read the
relevance of Plaintiffs' pretext evidence too narrowly (and
arguably weighed the evidence). To be sure, if Rolfs was the
lone source of the complaints, this post hoc documentation
would be stronger evidence of pretext. But the fact that other
sources were included does not render it irrelevant to the

pretext question. The document contains a considerable amount of past behavior that is now characterized as firing offenses, which courts have found to be evidence of pretext.

In any event, much of the relevance is the manner in which Rolfs' documentation happened. As noted, Rolfs admits he created the memo just weeks after Benjamin reported his violation. The jury can reasonably find Benjamin's report, not the contents of the memo, drove Rolfs' documentation effort. This is particularly true given that Rolfs had never documented or acted on most of the alleged issues in the past.

Rolfs' suspect documentation raises another problem – neither Rolfs nor anyone else at the College shared the contents of Rolfs' report with Benjamin or asked for his response before he was terminated. (Aplt. App. 340, 346).Rolfs concedes he did not address the alleged recruiting problems or the supposedly growing player complaints with Benjamin at any point before he was terminated. (Aplt. App. 300). Benjamin likewise testified he was never told about

these alleged issues either before or after he was terminated (Aplt. 182; 171, 249-50), which the College admits in its Reply brief. (Aplt. App. 405).

The jury could infer that Benjamin was not informed about the alleged 2017 issues – the so-called recruiting failure and the 2017 complaints – because his response would have damaged Rolfs and the College pretextual rationale.

Consider the recruiting issue. Rolfs' claims the roster shortage was due to Benjamin telling his players he was leaving and that he did not want to be there anymore. (Aplt. App. 106). But as Benjamin explained, there was no "failure to recruit" – those players left unexpectedly while Benjamin was recruiting for the 2017-2018 season, a reality dictated by the natural recruiting cycle of his sport. (Aplt. App. 236). Importantly, as Rolfs admits, Benjamin had already secured thirteen Letters of Intent for that upcoming season. *Id*. And even with the roster issue, Benjamin's team still with 30-16. Viewed in this light, Benjamin can hardly be charged with

failing to recruit and field a competitive team. The jury could infer from this evidence that not only was the this claim factually wrong, but that Rolfs, as Athletic Director, knew it was. That conclusion, if drawn by the jury, has the twin effect of showing Rolfs and the College did not truly believe this to be a non-retaliatory ground for termination and damaging Rolfs' credibility as to the rest of his story.

Likewise, had he been informed and allowed to respond, Benjamin would have disputed the 2017 player complaints and put the record into needed context, as he did in his deposition. Benjamin testified these complaints stem from a small group of friends who had gotten in trouble (often together) and been disciplined or dismissed from the team. (Aplt. App. 333, 337, 342; 346-48). Rolfs knew that one of the players had been dismissed and a reasonable inference can be drawn that he was aware of the incidents leading to disciplinary action more broadly. (Aplt. App. 337).  Thus, the jury could conclude that given the biased nature of the sources, neither Rolfs nor the College actually believed these

46

claims were worthy of termination. This is particularly true given that, unlike the two pre-2016 player complaints, Rolfs did not bring these complaints to Benjamin's attention in any way until this litigation was filed. (Aplt. App. 340, 346).

This Court has repeatedly found that termination under these circumstances can be circumstantial evidence of pretext. The "failure to conduct what appeared to be a fair investigation of [a] violation that purportedly prompted adverse action may support an inference of pretext." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314-15 (10th Cir. 2017); *see also Trujillo*, 524 F.3d at 1160; *Smothers*, 740 F.3d at 542-43.

In *Smothers*, the employee was fired because he had allegedly been hostile toward a co-worker and because he had violated a safety rule. 740 F.3d at 542-43. The employee claimed he was fired in retaliation for taking FMLA leave. The Court held that while the decision-makers spoke to others during their investigation, they did not bother to get the plaintiff's side of the story. *Id*. They instead relied on a

"one-sided" account to fire the employee. The Court held that because the employer never sought the plaintiff's side of things, "the record suggest[ed] that [the employer's] decision makers deliberately prevented [the plaintiff] from defending his actions with respect to the quarrel and consequently reached their conclusions about what transpired based on one-sided information." *Id.* at 543; *see also Trujillo*, 524 F.3d at 1160 (reversing summary judgment because one-sided investigation depriving plaintiffs of their say showed evidence they were fired because their son's illness meant costly healthcare not because of the alleged misconduct).

To be sure, in *Smothers* there was also evidence of disparate treatment and the Court relied on both to find sufficient bases to reverse the summary judgment. *Id.* But this case too contains other evidence of pretext, namely the timing of the termination, the lack of any prior investigation or discipline, and Rolfs' inconsistent handling of these types of issues. As in *Smothers*, then, this summary judgment should be reversed.

### 5. Benjamin's arguments have been preserved, but to the extext the Court finds otherwise, plain error review should apply.

The College may contend Benjamin forfeited the argument that pretext can be shown by Rolfs failure to inform Benjamin of the complaints by not asserting it in his opposition to the College's motion for summary judgment. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th 2011). But this issue has been adequately preserved.

Benjamin's opposition takes issue with Rolfs' investigative process, claiming it was effectively a sham because there had never been any discipline of, or serious documentation about, Benjamin's alleged issues before he reported the KJCC violations. Rolfs began to catalog his purported reasons only after he decided to remove Benjamin. (Aplt. App. 254-55). Furthermore, in response to the summary judgment motion, Benjamin asserted and the College agreed that he was never made aware of the factual specifics underlying his termination and there is no evidence

49

he even knew Rolfs was planning to remove him as coach. (Aplt. App. 249-50, 405).

Still, mindful of the potential forfeiture argument and this Court's case law, Benjamin alternatively seeks review of this additional circumstantial basis for pretext under the plain error standard. "To show plain error, a party must establish the presence of (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Richison*, 634 F.3d at 1128. While plain error review is rarely granted, this case warrants it.

As just explained, this Circuit has repeatedly found one-sided investigations in which the employee has had no opportunity to tell his side of the story, to be evidence of pretext. Coupled with the other evidence set out above, there are plain disputes about material facts on the pretext issue. Failing to correct this error, at this stage, undermines the fairness of the process by depriving Benjamin of a jury trial when it is apparent on the record that a jury could credibly

find in his favor. Correcting that error here promotes fairness and leaves neither the College nor the judicial system worse off.[9]

In the end, based on the temporal proximity between the whistleblowing and termination, the lack of any disciplinary action or reprimands against Benjamin, Benjamin's success as a coach, the inconsistencies in Rolfs' story, and the sham, papered up investigation, "a reasonable jury could conclude that [Benjamin] was fired" for reporting the KJCCC violations, rather than for the College's proffered reason.

---

[9] This Circuit has said that a summary judgment resolving warring legal theories based on undisputed facts is a poor fit for plain error review because we should not use the appellate process as a second chance to raise new legal theories. *Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005). But those concerns are minimized here where (1) disputes of fact abound, and (2) where the overarching arguments – the temporal proximity between whistleblowing and termination, lack of any prior discipline, and Rolfs' papering up the file – are closely related to (if not encompassing of) the premise that Rolfs' investigation was a sham in part because he never raised the issues with Benjamin.

## CONCLUSION

For the reasons stated above, the trial court's summary judgment should be reversed and Benjamin's retaliatory-discharge claim should reinstated for trial.

Oral argument is necessary because this case involves important issues about the scope of Kansas's common-law retaliatory discharge claim, the role of circumstantial evidence in the pretext analysis, and the modicum of evidence necessary to overcome a motion for summary judgment.

# MEMORANDUM AND ORDER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARC BENJAMIN,

     Plaintiff,

     v.

THE BOARD OF TRUSTEES OF BARTON
COUNTY COMMUNITY COLLEGE,

     Defendant.

Case No. 2:17-CV-2557-JAR-JPO

## MEMORANDUM & ORDER

     Plaintiff Marc Benjamin brings this action against his former employer, the Board of

Trustees of Barton County Community College ("Barton Community College" or "the College").

Plaintiff alleges that Barton Community College's termination of his employment violated

Kansas public policy against retaliatory discharge for whistleblowing, and breached an express

contract and an implied contract for continued employment.  This matter is before the Court on

the College's Motion for Summary Judgment (Doc. 36) on all of Plaintiff's claims.  For the

reasons discussed in detail below, the Court **grants** the College's motion for summary judgment

in its entirety.

## I.     Summary Judgment Standard

     Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In

applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

Add002

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II. Uncontroverted Facts

Under D. Kan. Rule 56.1(b), a memorandum opposing a motion for summary judgment must contain "a concise statement of material facts as to which the party contends a genuine issue exists."  Importantly, D. Kan. Rule 56.1(b) requires that each fact in dispute "refer with particularity to those portions of the record upon which the opposing party relies."[16]  As noted by the College, throughout his Response Plaintiff fails to consistently adhere to the standard provided for by D. Kan. Rule 56.1(b) and Fed. R. Civ. P. 56(c)(1)(A).  Plaintiff controverts many of the College's facts with no reference to the record nor a discussion explaining the basis for his

---

[11] *Adams*, 233 F.3d at 1246.

[12] Fed. R. Civ. P. 56(c)(4).

[13] *Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[16] *See also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support that assertion by: citing to particular parts of materials in the record . . . .").

challenge, or with general citations to his declaration or additional facts without specification or explanation. Accordingly, the Court deems undisputed those facts that Plaintiff failed to controvert with citation to particular facts in the record, if supported by the record.[17]

The following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff.

### *Plaintiff's Employment Contracts with Barton Community College*

Plaintiff Marc Benjamin, currently a resident of North Carolina, is the former Head Softball Coach at Barton Community College, a community college established under the provisions of the Kansas Community College Act.[18] The College employed Plaintiff as Head Softball Coach from August 1, 2013 to May 8, 2017. Athletic Director Trevor Rolfs supervised Plaintiff. Until May 31, 2016, Rolfs was both the Athletic Director and the head coach for the women's basketball team.

Plaintiff and the College entered into a total of four employment contracts. Plaintiff first entered into a Contract of Employment for Head Coaching Services with Barton Community College to be the head coach of its softball program for the 2013–2014 academic year. Following the expiration of the 2013–2014 Coaching Contract, Plaintiff and Barton Community College entered into three additional head coaching contracts, with identical terms to the 2013–2014 Coaching Contract, for the 2014–2015 academic year, the 2015–2016 academic year, and the 2016–2017 academic year.[19] Plaintiff's termination occurred during the term of the Contract of Employment for Head Coaching Services with Barton Community College for the 2016–2017

---

[17] Fed. R. Civ. P. 56(e)(2).

[18] K.S.A. 72-120 et seq.

[19] The term for Plaintiff's 2014–2015 academic year Coaching Contract was August 1, 2014 to May 31, 2015. The term for Plaintiff's 2015–2016 academic year Coaching Contract was August 1, 2015 to May 31, 2016. The term for Plaintiff's 2016–2017 academic year Coach Contract was August 1, 2016 to May 31, 2017.

Add004

academic year ("2016–2017 Coaching Contract"). The 2016–2017 Coaching Contract stated that the parties "understood that the head coach is an employee at will and . . . hold[s] their position during the term of the Contract . . . unless relieved of their duties prior to the expiration of the Contract or unless he/she resigns."[20] The 2016–2017 Coaching Contract also provided that: (1) "[i]n the event of termination, notice shall be given in writing and the employee shall be entitled to no further compensation as a result of the termination;" and (2) "[t]he College may, at its option, terminate the employment agreement without cause and without prior notice when said termination is necessitated by decisions of the College's Trustees to deal with budgetary shortfalls and that said termination is needed to live within Legislative and enrollment budgets."[21] Plaintiff understood that the 2016–2017 Coaching Contract stated he was "an employee at will,"[22] and he testified in his deposition that he understood the terms of the 2016–2017 Coaching Contract.[23]

Barton Community College's Employment Policy No. 1460, effective October 8, 2007, states that the College's policies and procedures are "not intended to create an employment contract [and] should not be construed to constitute contractual obligations of any kind between the College and any employee."[24] This policy further states there is "[n]o continuing employment rights or property rights in positions of employment in positions of employment are [sic] granted to College employees other than as specified in state statute or the contracts of

---

[20] Doc. 40-4 ¶ 6.

[21] *Id.*

[22] Doc. 37-7, Pl.'s Supp. Resp. to Def.'s Req. for Admis. ¶ 4.

[23] Doc. 37-5, Benjamin Depo. at 72:9–13.

[24] Doc. 37-3, Knoblich Decl. ¶ 2; Doc. 37-3, Ex. A.

contractual employees."[25]  Plaintiff was aware of Barton Community College's employment policies.[26]

### Athletic Conference Rules on Payment for Student-Athlete Travel

Barton Community College is a member of both the National Junior College Athletic Association ("NJCAA") and Kansas Jayhawk Community College Conference ("KJCCC"). Plaintiff's employment contracts required Plaintiff to abide by "all regulations, and policies of the College and its authorized representatives, as well as all Jayhawk Conference, regional, and NJCAA rules and regulations[.]"[27]  The College and its employees were required to comply with NJCAA rules, and its President, Dr. Carl Heilman, instituted a "zero tolerance" policy for NJCAA and KJCCC violations.[28]  A violation of the NJCAA rules could result in probation for the College's athletic program.

The NJCAA defines an "Athletic Scholarship," also referred to as a "grant-in-aid," as "any institutional athletic aid given to any student, from any source, on the basis of his/her athletic capabilities or athletic association."[29]  For Division I programs, which includes Barton Community College's basketball programs, the colleges may provide "a maximum grant-in-aid" consisting of tuition and fees, room and board, course related books, school supplies, and "[t]ransportation costs one time per academic year to and from the college by direct route."[30] The KJCCC also governs "grants-in-aid" to student athletes at member institutions.  The KJCCC rules regarding "grants-in-aid" are the same as the NJCAA's rules with nine exceptions.  Among

---

[25] Doc. 37-3, Knoblich Decl. ¶ 2; Doc. 37-3, Ex. A.

[26] Doc. 37-5, Benjamin Depo. at 51:19–54:3.

[27] Doc. 40-4 ¶ 5.

[28] Doc. 44-4, Rolfs Depo. at 24:9–13.

[29] Doc. 37-2, Rolfs Decl. ¶ 25.

[30] *Id.*

these nine exceptions, which include categories such as tuition, room and board, and medical treatment for injuries, is an exception for travel which provides that "[t]rips for recruits ten (10) days prior to the start of a semester are not allowed."[31]  There is no exception or comment in the KJCCC rules relating to payments for transportation costs of student athletes to and from the college.

As Athletic Director, Rolfs was responsible for "[p]reparing and recommending the department's annual budget to the Dean of Administration as well as overseeing and administering the budget."[32]  Rolfs testified in his deposition that he would review and approve flights for students purchased by the College and those that were purchased by head coaches.[33] Rolfs understood the KJCCC rules to allow its member colleges to pay for travel costs as grant-in-aid in accordance with the NJCAA rules.  Rolfs knew that, in line with this interpretation, the College provided occasional transportation costs to students.  In the summer of 2016, however, this practice stopped.

On July 7, 2016, KJCCC Commissioner Bryce Roderick emailed athletic directors of the member colleges, including Rolfs, explaining the KJCCC rules regarding trips for athletes. Roderick's email explained how he had learned of confusion regarding paid trips by athletes to the college.  He clarified that "[t]he KJCCC By-laws doesn't [sic] allow for aid trips by signed athletes to and from home or to the college" and that "under no circumstances can a signed athlete be given a paid trip."[34]  Roderick's email led to telephone calls between KJCCC member institutions and Roderick.

---

[31] *Id.* ¶ 26.

[32] *Id.* ¶ 1.

[33] Doc. 44-7, Rolfs Depo. at 22:16–23:7.

[34] Doc. 37-2 ¶ 28.

Add007

Rolfs believed that Roderick's statements were inconsistent with the NJCAA rules and the statement that the KJCCC allows the same grant-in-aid as allowed by the NJCAA except as otherwise stated.[35]  Roderick sent a follow-up email on July 8 to explain his interpretation of the KJCCC rule.  He advised that if a member institution was "paying transportation costs at anytime, [it] should self report this violation to the Conference Office so that [he] can take action" and that if a member institution knew that others were providing transportation, it should also report the violation to the Conference Office.[36]  He further explained that "[paying transportation costs] is a clear violation and gaining an advantage over other colleges that are not providing transportation costs."[37]

Although he disagreed with Roderick's interpretation of the KJCCC, Rolfs testified that Barton Community College complied with Roderick's instruction and ended its practice of paying for student-athlete transportation costs in July 2016.  Rolfs explained Roderick's interpretation of the KJCCC rule and the prohibition on paying for transportation costs to all of the College's coaches, including Plaintiff.

***Plaintiff's Reports of Alleged Violations of Athletic Conference Rules***

Plaintiff met with Rolfs on February 20, 2017 to inform him that he had learned that the College's men's and women's basketball coaches had paid for student flights to and from home, which violated athletic conference rules.  Plaintiff had received a list of at least six players whose flights appeared to have been paid for by the athletic department and a student whose flight had been paid for by another coach.

---

[35] *Id.*

[36] *Id.* ¶ 29.

[37] *Id.*

Add008

Plaintiff reported this to Rolfs because he was concerned about potential violations.[38]  He did not want Rolfs to be "caught off guard" if someone found out about the alleged violations, especially because of the College's history with NJCAA and KJCCC violations.[39]  Rolfs was suspicious of Plaintiff's reports of KJCCC violations because he believed Plaintiff was unhappy with his employment, particularly with Rolfs, but accepted Plaintiff's report and investigated his allegations.  Rolfs took handwritten notes during the meeting and according to Plaintiff, seemed uncomfortable and irritated.  Plaintiff emailed Rolfs to document his report, concluding his email with "I hope you will handle this matter professionally and that I will not be treated unfairly within the department."[40]

During his investigation of Plaintiff's complaints, Rolfs found two payments pertaining to the transportation of three men's basketball players and one women's basketball player, all of which had been submitted and approved before Roderick's July 2016 emails.  According to Rolfs, the men's tickets were properly purchased during allowable recruitment time under other KJCCC rules, and the women's ticket was purchased before the July emails for a student athlete to travel for the start of classes in August 2016.  Rolfs also determined that since July 7, 2016, Barton Community College had not paid travel costs for any student athletes.

In early March 2017, Rolfs informed Roderick that he was investigating Plaintiff's allegations of potential conference violations and explained that he had evidence of two requisitions submitted before Roderick's July 7, 2016 email.  The two agreed that Rolfs should finish his internal investigation and report back to Roderick, who would determine if the violations existed and if they did, what sanctions would be imposed.  In March 2017, Rolfs told

---

[38] Doc. 44-7 ¶ 4.

[39] *Id.*

[40] Doc. 37-5, Benjamin Depo. at 192.

Plaintiff that he had looked into the misuse of funds report and spoken with Roderick, and that the College was okay.[41]  In April 2017, Rolfs again spoke to Commissioner Roderick at the KJCCC/Region VI meetings regarding the reported violations.  They agreed to confer and resolve the issue by the end of May 2017.

During the same time-frame, Plaintiff met with Angela Maddy, Barton Community College's Dean of Student Services.  Maddy oversees the College's student services, but has no administrative or managerial authority over the College's athletic department.  Plaintiff, who according to Maddy seemed disgruntled, complained about a variety of things, including his treatment by Rolfs and the distribution of booster funding to programs in the athletic department.  Plaintiff also mentioned that some of the athletic programs or teams provided flights for student athletes.  Maddy encouraged Plaintiff to take his concerns through his chain of command.  She did not report any part of the conversation to others until May 10, 2017, after student basketball players met with her and expressed concerns about the athletic department providing flights for student athletes.  During her discussion with the students, Maddy recalled the conversation she had with Plaintiff about the College paying for student flights, and accordingly reported the information about the students' complaints and her conversation with Plaintiff to Dr. Heilman.[42]

On or about May 6, 2017, Plaintiff encountered Roderick at the Region VI Softball Tournament.  Plaintiff asked Roderick to explain KJCCC's procedure for reporting conference violations and whether Rolfs had informed Roderick about the potential basketball violations.  Roderick responded that Rolfs had mentioned he was looking into some potential conference violations, but that Rolfs had not gotten back to him on the subject.

---

[41] *Id.* at 196:16–197:1.

[42] Doc. 37-4, Maddy Decl. ¶ 3.

Add010

On May 20, 2017, Rolfs met with Roderick at the NJCAA Track & Field Nationals to discuss Plaintiff's report of violations.  Rolfs learned that Plaintiff had asked Roderick about his February 20, 2017 report of possible violations.  According to Rolfs, this was the first time he heard of Plaintiff contacting Roderick or the KJCCC regarding the allegations.[43]  Roderick and Rolfs discussed the findings of the investigation of the reported violations, and Roderick informed Rolfs that there would be no sanctions because the issues had been addressed in 2016 and were considered closed.

### *Termination of Plaintiff's Employment*

In April of 2016, Plaintiff told Rolfs that he felt underappreciated and that there was a lack of support for the softball program.  In May 2016, Rolfs learned that Plaintiff had depleted his fundraising account from around $18,000 to $1,000.  According to Rolfs, this violated Plaintiff's contract because his job description required that he establish a functional budget, maintain awareness of expenditures and stay within his budget.[44]  In June 2016, Rolfs met with Plaintiff for Plaintiff's annual performance review.  Plaintiff had achieved a 51-8 record, the best in the softball team's history.  Rolfs addressed both Plaintiff's successes and his concerns about Plaintiff's performance based on Plaintiff's negative attitude over the preceding months, his failure to adequately maintain the softball facilities, and his inability to manage the budget.  According to Rolfs, Plaintiff responded by insinuating that Rolfs should not worry about those matters.[45]  Despite the foregoing issues, Rolfs recommended that Plaintiff's contract be renewed for the 2016–2017 academic year, and agreed with the College's decision to give him a raise in compensation.

---

[43] Doc. 37-2, Rolfs Decl. ¶ 39.

[44] *Id.* ¶ 14.

[45] *Id.* ¶ 15.

Add011

During the summer of 2016, Rolfs observed that there were few Letters of Intent from softball recruits.  However, Plaintiff did have thirteen Letters of Intent for the 2017–2018 season. In August 2017, Rolfs learned that Plaintiff had failed to recruit new student athletes for the softball program and that most of the 2015–2016 team was not returning.  Plaintiff, who was "caught off guard"[46] when six to seven players did not return, only had nine players on his roster as opposed to the expected twenty.  By December, the roster had fifteen student athletes and by April 2016, the roster only had twelve.  According to Rolfs, the failure to recruit violated Plaintiff's contract and job description, which required that he produce a competitive program, attract and sign student-athletes, and field athletes and teams that can compete for championships.[47]  By October 2016, because Rolfs believed Plaintiff was disgruntled and blaming Rolfs for his problems, he informed the College's Director of Human Resources, Julie Knoblich, that Plaintiff was a disgruntled employee who would attempt to discredit him.  Around this time, Plaintiff and the former assistant softball coach made allegations to Knoblich and Maddy that Rolfs made inappropriate sexual, racial and demeaning comments, and Rolfs denies making these comments.

By mid-April 2017, Rolfs had received complaints from softball players and parents about Plaintiff's behavior, and was concerned that Plaintiff was taking his frustrations with his job and Rolfs out on the team.[48]  On April 11, 2017, Rolfs met with Knoblich to discuss his decision to not recommend renewal of Plaintiff's contract.  Between April 11 and April 24, Rolfs received telephone calls and emails from softball team members and parents about Plaintiffs' behavior and compiled a report based on these calls and emails.  Rolfs's report contained

---

[46] Doc. 37-5, Benjamin Depo. at 103:1–104:10.

[47] Doc. 37-7, Rolfs Decl. ¶ 19.

[48] Doc. 37-2 ¶ 34.

descriptions of Plaintiff's behavior from January 2016 through April 2017. Rolfs also included eight emails, dated from October 4, 2013 through April 24, 2017, that he received from parents and softball players. Rolfs received six of these emails after his April 11, 2017 conversation with Knoblich. With respect to these emails, Rolfs testified that after parents and student initiated conversations regarding concerns about Plaintiff's coaching performance with him, he would then ask them to send him the concerns they shared in writing for documentation purposes.[49] As to the report, Rolfs testified that "[t]hings are documented throughout the course of every year. This document itself was created fully the day I sent it in an email,"[50] which he clarified as being around April 2017. According to Plaintiff and the former assistant softball coach, he "did not yell in the faces of any players and it was not [his] practice to single out a player for ridicule or criticism."[51]

Rolfs met with Dr. Heilman to recommend that Plaintiff's contract not be renewed. Dr. Heilman informed Rolfs that, in consultation with the Board of Trustees, the College would terminate Plaintiff's employment immediately following the softball season. Dr. Heilman prepared a memorandum outlining the reasons for terminating Plaintiff. Prior to his termination, Plaintiff had not been disciplined during his employment with the College. The College's employment policies did not provide for progressive discipline. Instead, the College had discretion to employ a list of alternatives, including termination, to discipline employees.

On May 8, 2017, Rolfs met with Plaintiff and informed him that the College was terminating his employment immediately. Rolfs provided Plaintiff the May 8, 2017 memorandum written by Dr. Heilman regarding his termination. According to the

---

[49] Doc. 44-4, Rolfs Depo. 42:1–44-13.

[50] *Id.* at 39:1–40:19.

[51] Doc. 44-1, Benjamin Decl. ¶ 8; *see also* Doc. 44-2, Voss Decl. ¶ 7.

Add013

memorandum, Barton Community College terminated Plaintiff's employment due to: (1) insubordination; (2) verbal harassment; (3) unprofessional conduct; and (4) his inability to manage the Softball Program in an appropriate and professional manner.[52]  Although it terminated Plaintiff's employment before the expiration of the 2016–2017 Coaching Contract, Barton Community College paid Plaintiff the full compensation required under the contract as if Plaintiff had provided services through May 31, 2017.

## III.    Discussion

Plaintiff brings three alternative state law claims against Barton Community College— breach of express contract, breach of implied contract for continued employment, and common law retaliatory discharge.  The College seeks summary judgment on each of Plaintiff's claims.  As explained in detail below, the Court grants summary judgment in favor of the College on all of Plaintiff's claims.

### A.    Breach of Contract Claims

Plaintiff alleges two breach of contract claims under Kansas law—one arising out of an express contract with Barton Community College and the other arising out of an alleged implied contract for continued employment with Barton Community College.  The Court addresses each in turn.[53]

---

[52] Doc. 37-2 ¶ 38.

[53] Plaintiff asserts damages arising out of lost wages and benefits, compensatory or noneconomic losses, and punitive damages.  Doc. 31 at 11–12.  In addition to arguments regarding Plaintiff's ability to establish breach of contract claims, Defendants argue that Plaintiff has not suffered damages from the alleged breach of the employment contract.  In light of the clear determination that Plaintiff cannot sustain a cause of action under either a breach of express contract or breach of implied contract theory, the Court declines to address Defendants' argument related to the damages alleged by Plaintiff.

Add014

## 1.      Breach of Express Contract

Plaintiff alleges that Barton Community College breached the 2016–2017 Coaching

Contract by terminating his employment without cause.  The College contends that it did not

breach any express contract as the contract provided for an at-will employment relationship,

which either party could terminate at any time, for any reason.  The Court finds that Plaintiff was

an employee at-will, and that the College did not breach the 2016–2017 Coaching Contract as a

matter of law.

The construction of a written contract is a question of law.[54]  Generally, if the language in

a written contract "is clear and can be carried out as written there is no room for rules of

construction."[55]  "In considering a contract which is unambiguous and whose language is not

doubtful or obscure, words used therein are to be given their plain, general and common

meaning, and a contract of this character is to be enforced according to its terms."[56]  "The

cardinal rule of contract interpretation is that the court must ascertain the parties' intention and

give effect to that intention when legal principles so allow."[57]  "Where a contract is complete and

unambiguous on its face, the court must determine the intent of the parties from the four corners

of the document, without regard to extrinsic or parol evidence."[58]  The provisions of a written

contract must be interpreted as a whole and in harmony, rather than in isolation.[59]

---

[54] *See, e.g.*, *Ponds ex rel. Poole v. Hertz Corp.*, 158 P.3d 369, 372 (Kan. Ct. App. 2007).

[55] *Gore v. Beren*, 867 P.2d 330, 336 (Kan. 1994) (quotation omitted).

[56] *Wagnon v. Slawson Exploration Co.*, 874 P.2d 659, 666 (Kan. 1994) (quoting *Barnett v. Oliver*, 858 P.2d 1228, 1238 (Kan. Ct. App. 1993)) (internal quotation omitted).

[57] *Kay–Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996)).

[58] *Id.* (citing *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 887–88 (Kan. 1992)).

[59] *Decatur Cty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 574 (Kan. 1999) (citations omitted).

Generally, employment will be deemed at at-will unless there is an express or implied contract governing the duration of employment.[60]  Here, the written 2016–2017 Coaching Contract provided for Plaintiff's employment as the College's Head Softball Coach.  Whether the College breached this employment contract necessarily involves interpreting that contract.  The 2016–2017 Coaching Contract provided for a specific duration of employment to begin on August 1, 2016, and end on May 31, 2017.  Despite this, the contract also stated that the parties "understood that the head coach[, Plaintiff,] [wa]s an employee at will" and that he would hold the position "during the term of the Contract . . . unless relieved of [his] duties prior to the expiration of the Contract or unless [he] resigns."[61]  This language is unambiguous.  It unequivocally establishes that the College employed Plaintiff as the Head Softball Coach as an at-will employee during the term of contract.

Plaintiff asserts that a rational jury could find that the College breached the express employment contract because of the contract language that "[t]he College, may, at its option, terminate the employment agreement without cause and without prior notice when said termination is necessitated by decisions . . . to deal with budgetary shortfalls[.]"[62]  In arguing that the College's ability to terminate Plaintiff was limited, however, Plaintiff ignores preceding sentences which state "[i]n the event of termination, notice shall be given in writing . . ." and that Plaintiff was an at-will employee.[63]  The contract does not provide that Plaintiff could *only* be terminated in the event of a budgetary shortfall.  Instead, the contractual language relied upon by Plaintiff merely explains the College's termination rights in the event of a budgetary shortfall.

---

[60] *Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 3 (Kan. 2011) (citing *Morriss v. Coleman Co.*, 738 P.2d 841, 846–47 (Kan. 1987)).

[61] Doc. 40-4 ¶ 6.

[62] *Id.*

[63] *Id.*

Add016

Moreover, Plaintiff does not argue that the contractual provisions are ambiguous, and to the extent he implies this argument, the Court finds the contract is unambiguous.  An ambiguity argument also conflicts with Plaintiff's deposition testimony that there was nothing in the contract that was unclear to him about the College's right to terminate his employment at anytime.

Therefore, as provided by the 2016–2017 Coaching Contract, Plaintiff was an at-will employee of the College at the time of his termination.  When employment is terminable at will, "the employee states no cause of action for breach of contract by alleging that he has been discharged."[64]  Accordingly, Plaintiff's claim for breach of express contract fails as a matter of law, and the Court grants summary judgment in favor of the College on Plaintiff's breach of express contract claim.

### 2.      Breach of Implied Contract

Plaintiff additionally alleges that Barton Community College breached an implied contract for Plaintiff's continued employment as Head Softball Coach.  Defendant asserts that the facts do not support the existence of an implied contract for continued employment because Plaintiff relies solely on his unilateral beliefs of the existence of said implied contract.  Viewing the facts in a light most favorable to Plaintiff, the Court finds there was no implied contract for Plaintiff's continued employment as a matter of law.

As previously discussed, Kansas has long adhered to the doctrine of employment at-will.[65]  One exception to the at-will employment relationship recognized by Kansas courts is the

---

[64] *Davis v. LumaCorp, Inc.*, 992 F. Supp. 1250, 1253 (D. Kan. 1998) (citing *Pilcher v. Bd. of Wyandotte Cty. Comm'rs*, 787 P.2d 1204, 1207 (Kan. Ct. App. 1990)).

[65] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004) (quoting *Riddle v. Wal–Mart Stores, Inc.*, 998 P.2d 114, 115 (Kan. Ct. App. 2000)).

Add017

existence of an implied in fact contract.[66]  Under Kansas law, an implied employment contract

exists when an employer cannot terminate an employee arbitrarily because a "policy or program

of the employer, either express or implied, restricts the employer's right of termination at will."[67]

In *Morriss v. Coleman Co.*,[68] the Kansas Supreme Court articulated the following factors in

determining the existence of an implied contract:

> written or oral negotiations, the conduct of the parties from the
> commencement of the employment relationship, the usages of the
> business, the situation and objective of the parties giving rise to the
> relationship, the nature of the employment, and any other
> circumstances surrounding the employment relationship which
> would tend to explain or make clear the intention of the parties at
> the time said employment commenced.[69]

Whether an implied contract exists to prevent arbitrary termination of employment is

normally a question of fact for the jury.[70]  However, as "a contract implied in fact arises from

facts and circumstances showing mutual *intent* to contract,"[71] an implied agreement "cannot be

established solely by the employee's subjective understanding or expectation about his or her

employment."[72]  Thus, "summary judgment may be granted [in the defendant's favor] if the

plaintiff presents only evidence of his own unilateral expectations of continued employment."[73]

---

[66] *Kastner v. Blue Cross & Blue Shield of Kan., Inc.*, 894 P.2d 909, 915 (Kan. Ct. App. 1995) (citation omitted) ("One of the most important exceptions to the employment-at-will doctrine allows an action for wrongful discharge when an employee is fired in breach of an implied-in-fact contract of employment.").

[67] *Allsup v. Mount Carmel Med. Ctr.*, 922 P.2d 1097, 1100 (Kan. Ct. App. 1996) (quoting *Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 81 (Kan. 1991)).

[68] 738 P.2d 841 (Kan. 1987).

[69] *Id.* at 848–49 (quoting *Allegri v. Providence-St. Margaret Health Ctr.*, 684 P.2d 1031, 1033 Syl. ¶ 5 (Kan. Ct. App. 1984)).

[70] *Id.* at 848; *Anglemyer v. Hamilton Cty. Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

[71] *Kastner*, 894 P.2d at 915 (quotation omitted).

[72] *Id.* (citation omitted).

[73] *Conyers v. Safelite Glass Corp.*, 825 F. Supp. 974, 977 (D. Kan. 1993) (citation omitted); *see also Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 519 (D. Kan. 2007) (granting summary judgment where plaintiff relied on her own contentions and beliefs that her employer's intent was to not fire its employees without cause, but

Add018

Plaintiff asserts that he has presented evidence of his own expectation of continued employment and of the College's intent to enter into such an implied contract.  The College asserts that it had no intent to enter into an implied contract with Plaintiff.  Plaintiff has established no facts, other than his subjective, unilateral belief, that support the existence of an implied employment contract.  To support his assertion that the parties shared a mutual intent to enter into an implied contract for continued employment, Plaintiff relies on the following facts: (1) the annual renewal of his contract until his termination; (2) the head coach for the men's track team being employed for seven or eight years at the time of Plaintiff's termination; (3) the head coach for the men's basketball team being employed for about ten years at the time of Plaintiff's termination; and (4) Rolfs's use of substantial documentation to justify Plaintiff's termination.[74]

Even viewed in the light most favorable to Plaintiff, as a matter of law these facts do not support a claim for breach of implied contract.  They do not indicate the College intended to enter into an implied contract for Plaintiff's continued employment.  Instead, the facts support Plaintiff's unilateral belief of an implied contract based on successful employment with the College.  However, "[t]he mere fact that an employee has not been previously terminated under written contractual employment-at-will provisions does not create an implied contract for continuing employment."[75]  Otherwise, Kansas's at-will employment doctrine would be undermined, and any successful employment relationship could result in an implied contract for

---

failed to show her employer intended to enter into an agreement restricting its ability to terminate an employee at will).

[74] Doc. 43 at 26.

[75] *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 260 (Kan. 1994) (affirming a grant of summary judgment when the plaintiff relied on her continued employment with pay increases and satisfactory employment to support her theory of an implied contract for continued employment despite written, contractual employment-at-will provisions).

Add019

continued employment.  Accordingly, in the absence of facts demonstrating the parties' mutual

intent to enter into an implied contract for Plaintiff's continued employment, the Court grants

summary judgment in favor of Barton Community College on Plaintiff's breach of implied

contract claim.

### B.      Common-law Retaliatory Discharge

Despite Kansas's employment at-will doctrine, Kansas courts recognize a common-law

tort for wrongful discharge in violation of public policy when a terminated employee has acted

as a whistleblower.[76]  Plaintiff claims he was wrongfully discharged in retaliation for

whistleblowing, based on his reporting that the College had violated KJCCC rules regarding

paying for student-athlete transportation.  As explained below, the Court grants summary

judgment on Plaintiff's retaliatory discharge claim as the record does not contain clear and

convincing evidence to support an inference that the College's reasons for terminating Plaintiff

were pretextual.

Wrongful discharge claims under Kansas law are analyzed using the three-part

framework established in *McDonnell Douglas v. Green*.[77]  Under this framework, the plaintiff

has the initial burden of establishing a prima facie case that raises a rebuttable presumption of

retaliatory intent.[78]  Once the plaintiff establishes a prima facie case, the burden shifts to the

defendant to articulate a legitimate, nonretaliatory justification for the discharge.[79]  Finally, if the

defendant meets this burden, the burden shifts back to the plaintiff to "assert specific facts

establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up

---

[76] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan. 2004) (citations omitted).

[77] 141 U.S. 792, 824 (1973); *see Balfour v. Medicalodges, Inc.*, No. 05-2086-KHV, 2006 WL 37620410, at *12 (D. Kan. Dec. 19, 2006) (citing *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002)).

[78] *Foster*, 293 F.3d at 1193.

[79] *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001).

Add020

or pretext for retaliatory discharge."[80]

Under Kansas law, a retaliatory discharge claim must be established "by a preponderance of the evidence, but the evidence must be clear and convincing in nature."[81]  The Kansas Supreme Court has concluded that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."[82]  Because a federal court evaluating state claims is guided by federal standards governing summary judgment procedure, the evidentiary standard that Kansas courts apply on summary judgment do not apply.[83]  "[A] plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."[84]  Plaintiff is not required, however, to establish the elements of his or her prima facie case by clear and convincing evidence.[85]  The clear and convincing evidence standard applies once the burden shifts back to plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.[86]

### 1.      Prima Facie Case

To state a prima facie case for retaliatory discharge based on whistleblowing, Plaintiff must establish that (1) a reasonably prudent person would have concluded that Barton

---

[80] *Foster*, 293 F.3d at 1194 (quoting *Braken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).

[81] *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1198 (Kan. 1994).

[82] *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 898 (Kan. 2001).

[83] *See Foster*, 293 F.3d at 1194–95.

[84] *Id.* at 1195.

[85] *Id.* at 1193 n.3 (holding plaintiff to such standard at prima facie stage would pervert logic of *McDonnell Douglas* burden-shifting scheme adopted by Kansas courts; claimant's prima facie case not onerous burden).

[86] *Id.* at 1193 (if employer offers legitimate, nondiscriminatory reason for termination, burden shifts to plaintiff to show clear and convincing evidence of retaliation).

Add021

Community College violated rules, regulations, or the law pertaining to public health, safety, and general welfare; (2) Barton Community College had knowledge of Plaintiff's reporting of the alleged violation prior to his termination; and (3) Barton Community College terminated Plaintiff's employment in retaliation for his complaints.[87]  "However, the whistleblowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."[88]  The parties do not articulate a dispute regarding whether Plaintiff reported the alleged violations in good faith.  Barton Community College asserts that as a matter of law, Plaintiff cannot establish a prima facie case of retaliatory discharge because Plaintiff cannot establish the first and second elements of his prima facie case.  The Court finds that, taking all inferences in a light most favorable to Plaintiff, Plaintiff has satisfied his burden of establishing a prima facie case of retaliatory discharge based on whistleblowing.

### a.   The College's Alleged Violations of Relevant Rules

Defendant argues that Plaintiff's reports of alleged violations of rules related to paying costs of travel for student athletes do not satisfy the first prong of a prima facie case of retaliation.  The first element of a prima facie case of retaliatory discharge based on whistleblowing is that "a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare."[89]  "To support a retaliatory discharge claim, the public policy must be 'so definite and fixed that its existence is not subject

---

[87] *Palmer v. Brown*, 752 P.2d 685, 686 (Kan. 1988).

[88] *Id.* at 689–90.

[89] *Id.* at 690.

Add022

to any substantial doubt.'"[90]  Additionally, a plaintiff's claim must be directed at "violations of specific and definite rules, regulations, or laws."[91]  The Court finds that, at the summary judgment stage, Plaintiff's reports of alleged KJCCC violations satisfy these requirements.

First, to the extent that Plaintiff alleged violations of internal policies, the College asserts that "it is well established that violations of internal operating policies and procedures will not support a retaliatory discharge claim."[92]  While this statement misconstrues the strength of the law, courts have found that violations of internal operating policies and procedures will not support a claim for retaliatory discharge.[93]  Here, the Court does not find that the record supports a notion that the College's internal policies and procedures requiring compliance to athletic conference rules promotes public safety, health or general welfare.  Moreover, Plaintiff does not articulate why these internal policies and procedures promote public health, safety, or the general welfare, and thus should be treated differently.  Accordingly, any complaints Plaintiff made regarding misuse of funds in violation of internal policies and procedures cannot establish the first element of his prima facie case of retaliatory discharge.

The College also argues that Plaintiff's complaints regarding violation of the KJCCC cannot be the basis for a claim of retaliatory discharge.  After an extended explanation of why its

---

[90] *Goodman v. Wesley Med. Ctr.*, 78 P.3d 817, 593 (Kan. 2003) (quoting *Palmer*, 752 P.2d 685).

[91] *Id.* at 591.

[92] Doc. 37 at 34.

[93] *See Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 520 (D. Kan. 2007) (finding that the evidence cited by the plaintiff "failed to cite any evidence showing that her alleged whistleblowing pertained to any serious violation of rules or laws affecting public health, safety or welfare"); *Herman v. Western Fin. Corp.*, 869 P.2d 696, 704–05 (Kan. 1994) (affirming summary judgment on a retaliatory discharge claim and, holding that the specific internal policies at issue did not qualify as rules, regulations, or law pertaining to public health, safety, and the general welfare; *see also Cory v. City of Basehor*, No. 12-2547-JTM, 2014 WL 3396273, at *7 (D. Kan. July 11, 2014) (finding that the plaintiff could not establish the first element of a *prima facie* case of retaliatory discharge when the internal policies and procedures were too vague to qualify the plaintiff for whistleblower protection, and explaining that the holding in *Herman* was not that "internal policies could *never* qualify as 'rules' in a whistleblower claim").

Add023

interpretation of the athletic conference rules was reasonable,[94] the College argues that the allegedly violated rules are not specific and definite rules, regulations or laws pertaining to public health, safety, and general welfare.  However, viewing the facts in a light most favorable to Plaintiff, a reasonable jury could find that Plaintiff alleged violations of such rules.

In *Goodman*, the plaintiff argued that she was terminated in retaliation for reporting violations pursuant to the [Kansas Nurse Practice Act ("KNPA")], "which provides that a nursing license can be revoked if a nurse is found to have committed an act of professional incompetency as defined by [the Act]."[95]  The defendant argued that "the KNPA [wa]s not specific enough to establish clear public policy rules, regulations or law as the basis for a retaliatory discharge claim because it refer[red] to an undefined standard of care that requires a factual determination by the Kansas State Board of Nursing."[96]  The Supreme Court of Kansas determined that the KNPA requirement that nurses adhere to an articulated standard of care, which turns on the facts in each case, was insufficient to serve as a specific and definite rule pertaining to the public health and safety.[97]  Thus, the plaintiff failed to establish that a reasonable prudent person would have concluded her employer was engaged in acts violating rules regarding public health, safety, and the general welfare because the KNPA did not provide definite or specific rules and whether a violating occurred involves subjective opinions and determinations.[98]

---

[94] Whether the College's interpretation of the athletic conference rules was reasonable is not at issue.  As previously laid out, the standard for establishing a *prima facie* case of retaliation is whether a "reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violations of rules, regulations, or the law pertaining to public health, safety, and the general welfare[.]"  *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).

[95] *Id.* at 821.

[96] *Id.* at 822.

[97] *Id.* at 822–23.

[98] *See id.*

Add024

Here, the uncontroverted facts show that Plaintiff complained of alleged violations of the KJCCC rules on paying for travel costs for student athletes.  The College does not dispute that it paid for travel costs to student athletes as allowed under the NJCAA rules before July 7, 2017, when the KJCCC clarified that these payments were not allowed under KJCCC rules.  The College argues that because it had interpreted the KJCCC to allow for these types of payments until Roderick's July 7 email, that these rules are ambiguous, and that the record does not support that the College's actions were inherently wrongful.  Roderick, however, requested that if a member institution was "paying transportation costs at anytime, [it] should self report this violation to the Conference Office so that [he] can take action" and that if a member institution knew that others were providing transportation, it should also report the violation to the Conference Office.[99]  He also explained that "[paying transportation costs] is a clear violation and gaining an advantage over other colleges that are not providing transportation costs."[100]

Despite Rolfs's disagreement with Roderick's application of the KJCCC rules, unlike the KNPA rules at issue in *Goodman*, there is no indication that whether the KJCCC rules at issue are violated involve a subjective determination or turned on the facts of each case.  Moreover, whether the College's acts were inherently wrongful has no bearing on whether a reasonably prudent person would have concluded that the College violated rules, regulations, or the law pertaining to public health, safety, and general welfare.  At the summary judgment stage, inferences are viewed in the light most favorable to Plaintiff.  Accordingly, based on the uncontroverted facts, a reasonable jury could conclude that the College had violated specific

---

[99] Doc. 37-2 ¶ 29.

[100] *Id.*

Add025

rules meant to promote the general welfare.  Therefore, Plaintiff's reports of alleged violations satisfy the first prong of a prima facie case of retaliatory discharge.

### b.    Knowledge of Plaintiff's Reports

In addition to requiring the employer to have knowledge of the reporting, Kansas law requires the plaintiff to provide evidence that he reported the alleged violations to "*either company management or law enforcement officials*."[101]   However, a "whistleblower's report [does not have to] be made to a party with the authority to rectify the problem."[102]   The critical step is that "[a] worker who wants to come under the protections of [their decision to report a violation] must seek out the intervention of a higher authority, either inside or outside the company."[103]   Importantly, "[i]f the plaintiff reports the wrongdoing to corporate management, he must do so to management higher than that of the wrongdoer."[104]

The College argues that Plaintiff cannot show that the College had knowledge that he reported the alleged violations and that he did not report the alleged violations to appropriate higher management or law enforcement prior to the termination of his employment.  Plaintiff asserts that he reported alleged violations of KJCCC athletic conference rules to three

---

[101] *Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 14 (Kan. Ct. App. 2000) (emphasis in original) (quoting *Palmer*, 752 P.2d at 690).

[102] *Shaw v. Southwest Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 863 (Kan. Ct. App. 2009) (discussing the standard for reporting an alleged violation as found in *Fowler*).

[103] *Fowler*, 10 P.3d at 876 (Kan. Ct. App. 2000) (finding that a mere threat "to blow the whistle" prior to being terminated is insufficient to satisfy the requirement of reporting alleged violations to higher authority in a claim for retaliatory discharge); *see also Shaw*, 219 P.3d at 863.

[104] *Lykins v. CertainTeed Corp.*, No. 11-2133-JTM, 2012 WL 5471254, at *7 (D. Kan. Nov. 9, 2012) (citing *Shaw*, 219 P.3d at 863); *see also Conrad v. Bd. of Johnson Cty. Comm'rs*, 237 F. Supp. 2d 1204, 1268 (D. Kan. 2002) (finding that the plaintiff could not satisfy the requirement of reporting to higher management or law enforcement when she objected and complained about the alleged wrongdoer's decision to the alleged wrongdoer); *Goenner v. Farmland Indus., Inc.*, 175 F. Supp. 2d 1271, 1280 (D. Kan. 2001) ("The only reasonable interpretation of *Fowler*'s requirement of seeking out 'a higher authority' or 'higher management' is that it requires the plaintiff to report the wrongdoing to someone in authority above the wrongdoer."); *Shaw*, 219 P.3d at 863 (finding that a board, which had the ability to renew the wrongdoer's employment, constituted a higher authority within a company).

Add026

individuals: (1) Rolfs, his supervisor and the Barton Community College Athletic Director, (2) Maddy, Barton Community College Dean of Student Services, and (3) Roderick, the KJCCC Commissioner.  However, these complaints are insufficient, as a matter of law, to establish Plaintiff's claim of retaliatory discharge.

The undisputed facts show that on February 20, 2017, Plaintiff met with Rolfs to inform him that the College's men's and women's basketball coaches had paid for student flights to and from home in violation of athletic conference rules.  A former softball player had provided Plaintiff a list of six players whose flights appeared to have been paid for by the athletic department and one player whose flight had been paid for by another coach.  As Plaintiff reported this directly to him, Rolfs clearly had knowledge of this reporting of the alleged violations prior to recommending Plaintiff's contract not be renewed and Plaintiff's termination.

However, the College argues Rolfs is an alleged wrongdoer and thus an inappropriate figure for Plaintiff to have complained to.  A plaintiff who alleges wrongdoing to management within a company, "must do so to management higher than that of the wrongdoer."[105]  "Any objection or complaint that [a plaintiff] made to [the wrongdoer] would not qualify as a report to higher management or to law enforcement."[106]  As the Athletic Director, Rolfs was responsible for preparing and recommending the department's annual budget to the Dean of Administration and overseeing and administering the budget.  Rolfs also testified that he reviewed and approved flights purchased for students and those purchased by head coaches.  However, taking all inferences in light most favorable to Plaintiff, the record does not suggest that Plaintiff complained that Rolfs himself was purchasing the flights, that Plaintiff knew Rolfs had approved

---

[105] *Lykins*, 2012 WL 5471254, at *7 (citing *Shaw*, 219 P.3d at 863).

[106] *Conrad*, 237 F. Supp. 2d at 1268.

Add027

these flights, or that Rolfs knew these flights had been purchased in violation of KJCCC rules. Instead, the undisputed facts show only that Plaintiff reported to Rolfs allegations that the College's basketball coaches had purchased flights for students in violation of KJCCC rules and that Rolfs then investigated these complaints. Accordingly, Plaintiff's February 20 report to Rolfs satisfies the second prong of a prima facie case of retaliatory discharge.

However, as a matter of law, Plaintiff's reports to Maddy and Roderick do not constitute reporting to management or law enforcement. During Plaintiff's meeting with Maddy, he mentioned that some athletic programs or teams provided flights for students, and Maddy encouraged him to take his concerns to his superiors. On May 10, 2017, after receiving similar reports from students, Maddy emailed the College's president, informing him of the student reports and that Plaintiff had mentioned similar concerns earlier, but that she had assumed they had been resolved. This Court need not determine whether Maddy constituted a higher management authority because, even viewing the facts in a light most favorable to Plaintiff, the record does not support a finding that the College knew of Plaintiff's report to Maddy prior to terminating him. It is uncontroverted that Maddy informed Dr. Heilman about her discussion with Plaintiff on May 10, 2017, two days after the College terminated Plaintiff. Therefore, as a matter of law, Plaintiff's report to Maddy of alleged violations is insufficient to establish his claim for retaliatory discharge.

Lastly, Plaintiff informed KJCCC Commissioner Roderick on May 6, 2017 about the alleged violations. The Court need not determine whether Roderick was an appropriate authority figure for Plaintiff to report the alleged KJCCC violations to as the record does not support an inference that the College knew of this reporting prior to terminating Plaintiff. The uncontroverted facts establish that: (1) the College terminated Plaintiff on May 8, 2017; (2) Rolfs

Add028

had previously recommended to the College's Director of Human Resources on April 11, 2017 not to renew Plaintiff's contract for the 2017–2018 academic year; (3) the College's President informed Rolfs, that in consultation with the Board of Trustees, the College would terminate Plaintiff's employment immediately following the softball season; and (4) Rolfs did not learn of Plaintiff's May 6, 2017 discussion with Roderick about the alleged violations until May 20, 2017, at the NJCAA Track & Field Nationals.[107]   Plaintiff cites to no facts suggesting that Roderick shared the discussion he had with Plaintiff with anyone at the College prior to Plaintiff's termination.   Moreover, it was Dr. Heilman and the Board of Trustees who decided to terminate Plaintiff's employment prior to the expiration of the 2016–2017 Coaching Contract, not Rolfs who had suggested to not renew Plaintiff's employment nearly a month before Plaintiff reported the alleged violations to Roderick.   Therefore, as a matter of law, Plaintiff's reporting of the alleged violations to Roderick also cannot serve as the foundation for his retaliatory discharge claim.

### c.   Causation

Neither party explicitly addresses whether Plaintiff can establish the third prong of a claim of retaliatory discharge—that the College terminated Plaintiff's employment in retaliation for his complaints to Rolfs.   Viewing the facts in a light most favorable to Plaintiff, the Court finds that this prong is satisfied by the temporal proximity between Plaintiff's complaints to Rolfs and his termination.   Generally, a causal connection exists between the protected activity and materially adverse action "where the plaintiff presents evidence of circumstances that justify

---

[107] Plaintiff attempts to controvert the fact that Rolfs first learned of Plaintiff's May 6, 2017 discussion with Roderick on May 20, 2017 by pointing to Rolfs's deposition testimony that he did not recall the exact dates in May when he spoke with Roderick about Plaintiff's allegations. Doc. 43 at 7–8.  While this leads to an inference that Rofls spoke with Roderick multiple times about Plaintiff's allegations, this does not controvert his declaration that he learned of Plaintiff's May 6 conversation with Roderick about the possible violations on May 20 at the NJCAA Track & Field Nationals.

Add029

an inference of retaliatory motive."[108]  "One must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not [engaged in whistleblowing]."[109]  "Proximity in time between the [complaint] and discharge is a typical beginning point for proof of a causal connection."[110]

The uncontroverted facts show (1) that Plaintiff reported his allegations to Rolfs on February 20, 2017; (2) that Rolfs recommended to the Director of Human Resources that Plaintiff's contract not be renewed on April 11, 2017; (3) that sometime between April 11, 2017 and May 8, 2017 Rolfs and Dr. Heilman discussed Plaintiff's employment; and (4) that Rolfs met with Plaintiff and informed him that his employment was being terminated immediately on May 8, 2017.  While there is no minimum time-frame requirement for temporal proximity to establish a causal connection, courts have found that a three-month lag between protected activity and termination does not establish a causal connection, but that a one and a half month period between protected activity and adverse action may establish a causal connection.[111]  Here, there are less than three-months between Plaintiff's report to Rolfs and his termination and less than two months between Plaintiff's report to Rolfs and Rolfs's recommendation to not renew Plaintiff's contract.  Viewing the facts relating to the timing in the light most favorable to

---

[108] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007) (discussing the causation analysis for a prima facie case in a Title VII retaliation case).

[109] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (discussing the causation analysis for a prima facie case in a Title VII discrimination case).

[110] *Rebarchek v. Farmers Co-op. Elevator*, 35 P.3d 892, 899 (Kan. 2001).

[111] *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (indicating that a period of six weeks gives rise to a rebuttable inference of a causal connection, but that a period of three months does not).

Add030

Plaintiff, this is sufficient temporal proximity to establish the third-prong of a prima facie case of retaliatory discharge.

While the College briefly mentions in its Reply that there is no evidence that Dr. Heilman or the Board of Trustees, who made the final decision to terminate Plaintiff, knew of his February 2017 report to Rolfs,[112] this is contrary to the facts.  It is uncontroverted that Rolfs met with Dr. Heilman and recommended not renewing Plaintiff's contract, and that Dr. Heilman then informed Rolfs that, in consultation with the College's Board of Trustees, the College would terminate Plaintiff's employment immediately following the softball season.  The College does not provide any facts regarding what occurred during this discussion.  At summary judgment, all inferences are drawn in Plaintiff's favor.  Accordingly, Plaintiff can establish a prima facie case of retaliatory discharge.

### 2.    Legitimate, Non-Retaliatory Reason for Termination

As Plaintiff establishes a prima facie case of retaliatory discharge based on his report of alleged violations to Rolfs, the Court considers the College's reasons for Plaintiff's termination. As its legitimate, non-retaliatory reason of Plaintiff's termination, the College states it terminated Plaintiff because Plaintiff was insubordinate and engaged in verbal harassment and unprofessional conduct demonstrating an inability to manage the College's softball program in an appropriate and professional manner.  The relevant issue is not whether the stated reasons were wise, fair, or correct but whether the defendant honestly believed in those reasons and acted in good faith.[113]  In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."[114]  The Court's role is not to second guess an

---

[112] Doc. 50 at 29.

[113] *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

[114] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

Add031

employer's business judgment.[115]  The Court finds that the College has met its burden with its articulated reasons for Plaintiff's termination and turns to the third step of its analysis.

### 3.       Pretext

At this step of the *McDonnell Douglas* inquiry, the burden shifts back to Plaintiff to show that a reasonable jury could find the College's proffered reason for termination pretextual.  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[116]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[117]  "[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[118]  As noted, the College maintains that it terminated Plaintiff because Plaintiff was insubordinate and engaged in verbal harassment and unprofessional conduct, demonstrating an inability to manage the College's softball program in an appropriate and professional manner.  The Court finds that the record does not contain clear and convincing evidence to create a genuine issue of material fact and support an inference of pretext.

---

[115] *Stover*, 382 F.3d at 1076.

[116] *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[117] *Kendrick*, 220 F.3d at 1230.

[118] *Patel v. Univ. of Kan. Hosp. Auth.*, 345 F. App'x 343, 345 (10th Cir. 2009) (quotation omitted).

Add032

Plaintiff argues that evidence of not receiving any formal disciplinary action prior to his reporting of the alleged violations to Rolfs demonstrates pretext.  However, the lack of formal discipline cannot establish pretext because the College's employment policies do not require progressive discipline,[119]  and, the record does not suggest that Plaintiff was treated differently than those similarly situated to him with respect to the discipline process.   Additionally, Plaintiff's assertion that allegations of Rolfs's inappropriate conduct discredits the College's defense is inappropriate at the summary judgment stage as the Court does not weigh the credibility of the evidence at summary judgment.[120]  Moreover, Plaintiff's allegations are that Rolfs made sexual, racial, and demeaning comments, which Plaintiff and the former assistant softball coach told Maddy and Knoblich about in October 2016.  Assuming the truth of these allegations, Rolfs's comments have no bearing on whether the stated reasons for Plaintiff's May 2017 termination—insubordination and unprofessionalism—are pretextual, and they have no relationship to any of the other facts Plaintiff points to as evidence of pretext.

Plaintiff also argues that the record shows excessive documentation of Plaintiff's activities prior to his termination, which demonstrates an apparent attempt to paper his file to support his termination.  He notes that Rolfs admitted to carefully preparing a timeline documenting Plaintiff's behavior, which he finalized in April 2017, and that Rolfs collected emails of parent and student complaints about his conduct.  Plaintiff relies on *Marshall v. General Motors, LLC* as support for his papering theory.[121]  The Court finds *Marshall*

---

[119] *See Lobato v. N.M. Env't Dep't*, 733 F.3d 1283–90 (10th Cir. 2013) (finding that a plaintiff could not establish pretext based on failure to use progressive discipline when the record did not support a finding that progressive discipline was mandatory).

[120] *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994) ("[On] a motion for summary judgment [the court] cannot evaluate credibility nor can [it] weigh the evidence.").

[121] *Marshall v. General Motors LLC*, No. 2:16-cv-02651, 2017 WL 5465270 (D. Kan. Nov. 14, 2017).

Add033

distinguishable.  In *Marshall*, the court determined that a reasonable jury could find that the plaintiff's supervisor papered his file to justify removing the plaintiff from his supervisory position because of his complaint about a racist remark of his supervisor.[122]  In the seven months prior to the complaint, the plaintiff's supervisor documented two instance of performance-related issues.[123]  However, in the seven months between the time of the plaintiff's complaint and the decision to return the plaintiff to a non-supervisory position, the plaintiff's supervisor documented more than a dozen issues, some of which did not necessarily relate to plaintiff's performance.[124]

Here, while the record shows that the number of player and parent complaints about Plaintiff increased between the time he reported the alleged KJCCC violations to Rolfs and his termination, it is undisputed that these complaints came from softball players and their parents, not directly from Rolfs.  Although Plaintiff notes that Rolfs requested the complaints about Plaintiff's coaching behavior be submitted in writing, it is uncontroverted that the players and parents initiated conversations with Rolfs, and that Rolfs then requested they articulate their concerns in writing for documentation purposes.  Moreover, while Plaintiff asserts that he did not yell in the faces of or ridicule players, there are no allegations that Rolfs falsified any of the complaints or emails, and the record does not support an inference that Rolfs solicited these complaints from the parents and students.  With respect to Rolfs's documentation of Plaintiff's performance, it is also uncontroverted that Rolfs's timeline of Plaintiff's performance issues spans from January 2016, when Rolfs first noticed Plaintiff's performance issues, to April 2017, and although he finalized this time in April 2017, that "things are documented throughout the

---

[122] *Id.* at *8.

[123] *Id.*

[124] *Id.*

Add034

course of the year."[125]  Even viewing these facts in a light most favorable to Plaintiff, a

reasonable jury could not infer that Rolfs papered Plaintiff's file.

Accordingly, the Court finds that a reasonable jury could not find that the College's

proffered reasons for terminating Plaintiff are unworthy of belief as the record does not contain

clear and convincing evidence that reveals a genuine issue of material fact as to pretext.  The

College is therefore entitled to summary judgment on Plaintiff's claim of retaliatory discharge.

**IT IS THEREFORE ORDERED BY THE COURT** that Barton Community College's

Motion for Summary Judgment (Doc. 36) is **granted.**  Plaintiff's case is dismissed in its entirety.

**IT IS SO ORDERED.**

Dated: February 1, 2019

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[125] Doc. 44-4, Rolfs Depo. at 39:1–40:19.

# United States District Court

**-------------------------- DISTRICT OF KANSAS----------------------------**

**MARC BENJAMIN,**

        **Plaintiff,**

**v.**                                  **Case No:  17-2557-JAR-JPO**

**THE BOARD OF TRUSTEES OF BARTON
COUNTY COMMUNITY COLLEGE,**

        **Defendant,**

## JUDGMENT IN A CIVIL CASE

☐    Jury Verdict.   This action came before the Court for a jury trial.  The issues have been
tried and the jury has rendered its verdict.

☒    Decision by the Court.  This action came before the Court.  The issues have been
considered and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

    That pursuant to the Memorandum and Order filed on February 1, 2019 (Doc. 51),
that Defendant's Motion for Summary Judgment (Doc. 36) is GRANTED.  Plaintiff's
case is dismissed in its entirety.

2/1/2019 _____                     TIMOTHY M. O'BRIEN
      Date                           CLERK OF THE DISTRICT COURT

                                      by: _s/Bonnie Wiest_____
                                           Deputy Clerk

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) because it contains 9508 words.

This brief also complies with the typeface requirements in Fed. R. App. 32(a)(5) and the typestyle requirements in Fed. R. App. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook typeface, font size 14.

All privacy redactions required by the rules have been made and this ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program, Bitdefender Virus Scanner, last updated on June 3, 2019, and according to the program it is free of viruses.

Finally, I certify that the hard copy of this brief submitted to the Court is an exact copy of that filed via ECF.

Respectfully submitted,

BONUCHI LAW


  /s/ *Anthony Bonuchi*
Anthony Bonuchi MO #57838
601 Walnut, Ste 300
Kansas City, Missouri 64106
(816) 944-3232; FAX (816) 944-3234

*Attorney for Appellant*

54

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed with the Clerk of the Court through the Appellate CM/ECF System. I certify that all participants are registered CM/ECFF users and service will be accomplished by that system.

/s/ *Anthony Bonuchi*
Attorney for Appellant